No. 23-15702

# In the
# United States Court of Appeals
# For the Ninth Circuit

SANDRA M. MEZA-PEREZ,

*Plaintiff – Appellant,*

v.

SBARRO, LLC; et. al.,

*Defendants – Appellees*

On appeal from the United States District Court for the District of Nevada
Case No. 2:19-cv-373-APG-EJY

Honorable Andrew Gordon, Presiding

## SBARRO'S ANSWERING BRIEF

PATRICK HICKS
Nevada Bar No. 4632
KELSEY STEGALL
Nevada Bar No. 14279
**LITTLER MENDELSON**
3960 Howard Hughes Pkwy.
Suite 300
Las Vegas, Nevada 89169

JASON HICKS
Nevada Bar No. 13149
**GREENBERG TRAURIG**
10845 Griffith Peak Dr.
Suite 600
Las Vegas, Nevada 89135

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1(a) and (d)(1), Appellees Sbarro, LLC and Sbarro, Inc. submit this statement identifying the following entities:

- Sbarro Holdings, Inc.

- New Sbarro Finance, Inc.

- New Sbarro Intermediate Holdings, Inc.

- Sbarro of Las Vegas, Inc.

Dated April 26, 2024.                    Respectfully submitted,

GREENBERG TRAURIG, LLP

By:  */s/ Jason Hicks*
     *Attorneys for Sbarro*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ...................................................................vi

INTRODUCTION ..............................................................................1

STATEMENT OF JURISDICTION............................................................2

COUNTER-STATEMENT OF THE ISSUES ...............................................3

COUNTER-STATEMENT OF FACTS .......................................................5

 *Perez's background* ........................................................................5

 *Perez claimed she was constantly mistreated and abused*...........................7

 *Perez committed fraud and perjured herself to obtain employment at*
 *Sbarro* ........................................................................................9

 *Perez agrees that her hours are variable* ..............................................10

 *Perez and Ceballes begin a secret affair*..............................................11

 *Sbarro's human resource policies and contact information were*
 *available to Perez, and she could report a complaint if she felt harassed*
 ........................................................................................16

 *Perez transfers to Bally's* ...............................................................18

 *Perez makes contact with Sbarro's HR twice, but neither are about*
 *alleged sexual assault or harassment*.................................................19

 *Perez gets into an argument with a co-worker who she believes came*
 *between her and Ceballes*................................................................22

 *Perez goes to NERC and, on NERC's advice, files a police report* .............23

 *Perez notifies Sbarro for the first time, Sbarro immediately*
 *investigates, but Perez refuses to cooperate*.......................................24

*NERC finds "no corroboration" for Perez's charge of harassment but still issues a partial cause finding* ................................................................28

*Perez shares her desire to "get her papers" and win money* ......................28

*Perez gets arrested and held on immigration violations*..............................29

*Perez files this lawsuit and later amends her complaint to include objectively false allegations of sex trafficking, which would support her visa efforts*................................................................................................31

*Perez's counsel are personally sanctioned under Rule 11*...........................33

*Perez, through counsel, evidences her intent to pursue a T and/or U Visa* ...............................................................................................................35

SUMMARY OF THE ARGUMENT .....................................................................36

LEGAL ARGUMENT............................................................................................38

I.     PEREZ'S CLAIMS AGAINST SBARRO ARE BARRED BY THE STATUTE OF LIMITATIONS ..................................................38

II.    THE DISTRICT COURT DID NOT ERR IN DENYING PEREZ'S MOTION FOR MISTRIAL DUE TO "ATTORNEY MISCONDUCT"...................................................................................39

     A.    *Standard of review* .................................................................45

     B.    *Sbarro's statements in opening were not improper and were supported by the evidence* ......................................45

     C.    *Even assuming Sbarro's isolated statements in opening were improper, they did not rise to the level of prejudice warranting a mistrial* .........................................52

III.   THE DISTRICT COURT DID NOT ERR IN RULING ON EVIDENTIARY OBJECTIONS NOR DID IT ERR IN DENYING PEREZ'S POST-TRIAL MOTIONS..............................55

     A.    *Standard of Review* ...............................................................55

     B.    *The district court did not err in overruling Perez's Rule 412 objection.* ................................................................56

C.    *The district court did not err in admitting evidence from Perez's immigration proceedings*.................................. 57

D.    *The district court did not err in allowing the jury to hear an audio recording of Perez's counsel in which she told the immigration court that she intended to seek a T or U Visa.* .................................................. 58

E.    *The district court's reference to the immigration court as "justice court" is immaterial.* ................................. 59

F.    *Defense counsel did not violate the district court's ruling on Perez's motion to exclude reference to the fact of Rule 11 sanctions* ........................................ 60

G.    *The district court managed the trial appropriately* .............. 61

IV.    THE JURY VERDICT WAS SUPPORTED BY THE EVIDENCE .......................................................................62

V.    THE DISTRICT COURT DID NOT ERR IN GRANTING, IN PART, SBARRO'S MOTION FOR SUMMARY JUDGMENT.......65

VI.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ITS PRE-TRIAL OR PROCEDURAL RULINGS .....................66

A.    *The district court did not abuse its discretion in allowing one of Perez's many counsel to withdraw five months prior to trial* ........................................ 66

B.    *The district court did not err in denying Perez's second motion to continue trial*............................................. 68

C.    *The district court and magistrate judge did not err in denying Perez's request to extend discovery.* .................... 69

VII.    THE DISTRICT COURT DID NOT ERR IN ITS RULINGS ON MOTIONS IN LIMINE OR AS IT CONCERNED PLAINTIFF'S PSYCHOLOGICAL EXPERT, DR. ROITMAN ......70

VIII.    PEREZ HAS NO VALID OBJECTION TO THE MAGISTRATE JUDGE'S ORDER AWARDING ATTORNEY'S FEES IN CONNECTION WITH SBARRO'S

MOTION TO COMPEL, OR WITH RESPECT TO THE DISTRICT COURT'S ORDERS ON DEFENDANTS' BILLS OF COST ........................................................................................73

IX. THE DISTRICT COURT DID NOT ERR IN AWARDING EACH PARTY THREE PEREMPTORY CHALLENGES OR IN DENYING PEREZ'S POST-TRIAL MOTION TO RECONSIDER THE ADMISSIBILITY OF IMMIGRATION EVIDENCE ...........................................................................74

X. THE DISTRICT COURT DID NOT ERR IN ITS RULINGS ON PEREZ'S MOTIONS IN LIMINE......................................................77

XI. THE DISTRICT COURT DID NOT ERR IN ITS RULINGS ON PEREZ'S MOTIONS FOR SPOLIATION ........................................78

    A. *There was no surveillance footage and Sbarro did not destroy any such evidence*.................................................. 78

    B. *Sbarro did not "destroy" the physical walk-in cooler*........................................................................... 79

XII. DEFENDANTS DID NOT ENGAGE IN PROHIBITED "GOLDEN RULE" ARGUMENTS ....................................................84

CONCLUSION .........................................................................................85

STATEMENT OF RELATED CASES ...................................................87

## TABLE OF AUTHORITIES

**Cases**                                               **Page(s)**

*Anheuser-Busch, Inc. v. Nat. Beverage Distributors*,
69 F.3d 337 (9th Cir. 1995) .................................................................53

*Arizona v. ASARCO LLC*,
773 F.3d 1050 (9th Cir. 2014) ............................................................58

*Charyulu v. Cal. Cas. Indem. Exch.*,
523 Fed. Appx. 478 (9th Cir. 2013).....................................................46

*Entm't Research Group, Inc. v. Genesis Creative Group, Inc.*,
122 F.3d 1211 (9th Cir. 1997) ...............................................40, 58, 77

*Geders v. United States*,
425 U.S. 80 (1976)...............................................................................62

*Gorio v. Block*,
972 F.2d 1339 (9th Cir. 1992) .............................................................54

*Haddad v. Lockheed California Corp.*,
720 F.2d 1454 (9th Cir. 1983) .............................................................56

*Han v. Stanford Univ.*,
210 F.3d at 1040 ..................................................................................77

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) .............................................................44

*Henry v. Gill Indus., Inc.*,
983 F.2d 943 (9th Cir. 1993) ...............................................................45

*Howard v. Connett*,
2017 U.S. Dist. LEXIS 172130, 2017 WL 4682300 (D. Nev. Oct.
17, 2017) ..............................................................................................84

*Indep. Towers of Wash. v. Washington*,
350 F.3d 925 (9th Cir. 2003) .........................................40, 56, 62, 77

*Johnson v. Mammoth Recreations, Inc.*,
975 F.2d 604 (9th Cir. 1992) ...............................................................69

*Jordan v. Clark*,
    847 F.2d 1368 (9th Cir. 1988) ...................................................36, 37, 64, 83

*Kehr v. Smith Barney, Harris Upham & Co.*,
    736 F.2d 1283 (9th Cir. 1984) ...................................................52, 53

*LaGrand v. Stewart*,
    133 F.3d 1253 (9th Cir. 1998) ...................................................67

*Landes Const. Co., v. Royal Bank of Canada*,
    833 F.2d 1365 (9th Cir. 1987) ...................................................85

*Lee v. Venetian Casino Resort, LLC*,
    747 Fed. Appx. 607 (9th Cir. 2019) ...................................................38

*Link v. Wabash R. Co.*,
    370 U.S. 626 (1962) ...................................................72

*McKinley v. City of Eloy*,
    705 F.2d 1110 (9th Cir. 1983) ...................................................45

*Meritor Sav. Bank, FSB v. Vinson*,
    477 U.S. 57 (1986) ...................................................36, 64, 65, 66

*Miller v. Fairchild Industries, Inc.*,
    885 F.2d 498 (9th Cir. 1989) ...................................................58

*Molski v. M.J. Cable, Inc.*,
    481 F.3d 724 (9th Cir. 2007) ...................................................63

*Nehring v. Empresa Lineas Maritimas Argentinas*,
    401 F.2d 767 (5th Cir. 1968) ...................................................76

*Nuelsen v. Sorensen*,
    293 F.2d 454 (9th Cir. 1961) ...................................................37, 64, 83

*Palmer v. Valdez*,
    560 F.3d 965 (9th Cir. 2009) ...................................................66

*Payan v. Aramark Mgmt. Servs. Ltd. P'ship*,
    495 F.3d 1119 (9th Cir. 2007) ...................................................38

*Pruco Life Ins. Co. v. Wilmington Trust Co.*,
  616 F. Supp. 2d 201 (D.R.I. 2009) ...................................................71

*Rattlesnake Coal. v. U.S. Envtl. Prot. Agency*,
  509 F.3d 1095 (9th Cir. 2007) ...................................................40, 56, 58

*Doe ex Rel. Rudy-Glanzer v. Glanzer*,
  232 F.3d 1258 (9th Cir. 2000) ...................................................41, 44, 45

*Ruvalcaba v. City of Los Angeles*,
  64 F.3d 1323 (9th Cir. 1995) ...................................................55, 56, 76

*Saman v. Robbins*,
  173 F.3d 1150 (9th Cir. 1999) ...................................................60

*Scholar v. Pac. Bell*,
  963 F.2d 264 (9th Cir. 1992) ...................................................38

*Sec. & Exch. Comm'n v. Jasper*,
  678 F.3d 1116 (9th Cir. 2012) ...................................................44, 54

*Settlegoode v. Portland Pub. Schs*,
  371 F.3d 503 (9th Cir. 2004) ...................................................49, 50

*Standard Industries, Inc. v. Mobil Oil Corp.*,
  475 F.2d 220 (10th Cir. 1973) ...................................................75

*Taddeo v. Am. Invsco Corp.*,
  2015 U.S. Dist. LEXIS 94052 (D. Nev. July 20, 2015) ...................................................84

*United States v. Kojayan*,
  8 F.3d 1315 (9th Cir. 1993) ...................................................50

*United States v. Magdaleno*,
  43 F.4th 1215 (9th Cir. 2022) ...................................................45

*United States v. Rhodes*,
  713 F.2d 463 (9th Cir. 1983) ...................................................39, 54

*United States v. Soto*,
  769 Fed. Appx. 472 (9th Cir. May 1, 2019) (unpublished) ...................................................84

*United States v. St. Marks*,
  460 Fed. Appx. 682 (9th Cir. Dec. 2, 2011) (unpublished) ...............................84

*United States v. Warren*,
  25 F.3d 890 (9th Cir. 1994) .................................................................74

*Venegas v. Wagner*,
  831 F.2d 1514 (9th Cir. 1987) ..............................................................63

**Statutes**

28 U.S.C. § 1870 ..............................................................................4, 74, 75

42 U.S.C. § 2000e-5(f)(1) ......................................................................38

**Rules**

Circuit Rule 27-14 ..............................................................................36

Fed. R. Civ. P. 11 .........................................................................*passim*

Fed. R. Civ. P. 37(a)(5)(C) ................................................................73, 74

Fed. R. Civ. P. 47 .................................................................................4

Fed. R. Civ. P. 47(b) ............................................................................74

Fed. R. Civ. P. 54(d)(1) .........................................................................74

Fed. R. Civ. P. 412 .........................................................................55, 56

Fed. R. Evid. 401 ................................................................................58

Fed. R. Evid. 412 ................................................................................56

Fed. R. Evid. 608(b) .............................................................................76

Fed. R. Evid. 611 ................................................................................62

Fed. R. Evid. 804 ................................................................................73

Fed. R. Evid. 807 ................................................................................73

Local Rule 26-1(b)(1) ........................................................................69, 70

Local Rule 54-1(c) ...............................................................................74

Local Rule 54-1(d) ..............................................................................74

## **INTRODUCTION**

After ten days of trial, the mixed race, mixed gender jury of ten returned a verdict in favor of Defendants/Appellees Zachary Ceballes ("Ceballes"), Sbarro, LLC, and Sbarro Inc., d/b/a Sbarro Pizza ("Sbarro"). Plaintiff/Appellant Sandra Meza-Perez ("Perez") testified for hours across several days of this two-week trial, after which the jury made its credibility determinations and rejected her extraordinary allegations of rape, abuse, and sex trafficking, and request for nearly $178 million. The expansive, plaintiff-friendly verdict form used, over defendants' objections, makes clear that the jury simply did not believe Perez's tale.

Perez spun these allegations from a workplace romance with her co-worker, Ceballes. The pair had a six-month relationship and engaged in dozens of sexual acts, which they kept hidden from Sbarro and their significant others. After Ceballes ended their affair, Perez – angry that another woman came between them – blew up. She concocted an outlandish story about a criminal sex trafficking ring at Sbarro, aimed at exploiting its employees' immigration status and blessed by company executives. She claimed that Sbarro knew of, facilitated, covered up, and "profited" from these alleged crimes but stayed silent to protect its so-called "golden goose" in Ceballes, an unremarkable manager of a modestly producing fast-food restaurant.

The jury likely wondered why Perez would fabricate such implausible yet serious claims. Sbarro prodded deeper and learned that Perez was in the United

States illegally and, having been arrested and held on immigration violations, needed an out. Her fellow ICE inmates educated her on certain visas, called U and T Visas, that could delay her deportation or secure U.S. permanent residency. Being a victim of human trafficking, for example, could support such applications. She hired an immigration lawyer to assist her.

A major problem for Perez, however, is her claims were rendered impossible by the timeline of events, even according to her own complaint. Perez – who self-described as a paranoid addict – was unable to keep her story straight, repeatedly offering contradictions to explain the impossibilities in her own timeline. She could not muster a single witness to testify on her behalf, including family members who worked with her at Sbarro and who had already provided damaging statements to investigators.

The jury evaluated Perez and Ceballes and was ultimately unmoved by her story. Rather, the jury concluded that the pair had a consensual, secret affair, and found against Perez on all claims as to all defendants. She now challenges nearly every ruling made by the district court, as well as the jury's verdict against her, which is necessarily based on unassailable credibility determinations. Her appeal is desperate and meritless.

## STATEMENT OF JURISDICTION

Sbarro does not contest Perez's jurisdictional statement.

2

## **COUNTER-STATEMENT OF THE ISSUES**

1.      Whether Perez's claims are barred by the statute of limitations such that this Court need not consider any of her arguments?

2.      Whether Sbarro committed misconduct through isolated statements in opening and, if so, whether the same permeated the two-week trial and deprived Perez of a fair trial?

3.      Whether the district court committed reversible error in its evidentiary rulings?

4.      Whether the jury verdict was supported by the evidence, including whether its core credibility determinations are assailable on appeal?

5.      Whether the district court committed reversible error in declining to equitably toll certain of Perez's claims against Sbarro and granting partial summary judgment and, if so, whether such error was harmless because the jury found in favor of Ceballes such that there would be no vicarious liability anyways?

6.      Whether the district court abused its discretion by allowing some of Perez's several lawyers to withdraw five months prior to trial, denying her second motion to continue trial years into the case, or declining to extend discovery beyond the already-enlarged discovery period?

7.      Whether the district court committed reversible error in its rulings on her motions in limine or as it concerns her psychological expert?

3

8.      Whether the unobjected-to bills of costs and the magistrate judge's discovery sanctions are subject to challenge on appeal?

9.      Whether the district court abused its discretion in allowing Sbarro to exercise three peremptory challenges, as is called for by Fed. R. Civ. P. 47 and 28 U.S.C. § 1870.

10.      Whether the district court committed reversible error in denying Perez's motions for spoliation sanctions?

11.      Whether the defense engaged in prohibited "Golden Rule" arguments in closing, whether Perez waived her appeal on this issue by not objecting at trial, and, if not, whether the alleged comments constitute reversible error?

## COUNTER-STATEMENT OF FACTS

Perez's "Statement of Facts" is approximately one page and unsupported by a single citation to the evidence. That is perhaps because her version of events was refuted by the jury and finds no support in the record. Though one of her challenges is to the sufficiency of the evidence, Perez shies away from the testimony and did not submit a single trial exhibit as part of her excerpts. The following is a summary of the facts that were adduced at trial.

### *Perez's background*

Perez is married to Oscar Ramos, who has been in prison since 2014. 5-ER-1096-97. Perez has a daughter named Karla and a son named Edgar. *Id.* Karla briefly worked with Perez at Sbarro before demanding that her mother be moved to a different shift because they got into fights at work; according to Karla, Perez was "bad news" and lied and stole from her. 8-ER-2103-04. Karla refused to be interviewed by investigators concerning her mother's allegations. *Id.* at 2163. Perez's son, Edgar, went to work at Sbarro in May 2019, two years *after* his mother filed her administrative complaint and months after she filed this lawsuit. 6-ER-1433. As of the Fall 2022 trial, Perez's niece, Aida, remained a manager at Sbarro. *Id.* at 1434. None of Perez's family members testified on her behalf. Her family's lack of support at trial and their continued employment at Sbarro after she made her

5

allegations (or in Edgar's case, decision to seek employment) likely spoke to the jurors.

Perez has been addicted to methamphetamine since at least 2006, 9-ER-2277, and she used it while employed at Sbarro. 6-ER-1314-16; 1351-52. Her pre-work routine was to smoke marijuana before her shift, *Id*. at 1313-15, and at least one employee witnessed her use methamphetamine while on the job. 8-ER-1913-14. Perez conceded her drug use and confided in her social worker while incarcerated post-Sbarro concerning her "dependence" on narcotics. 9-ER-2277-78, 2281. Her extensive use of narcotics likely impacted the jury's evaluation of her ability to accurately perceive and relay her interactions with defendants.

Both side's experts agreed Perez suffers from various psychological ailments, including mixed personality, stimulant use, and posttraumatic stress disorders, all pre-dating her employment at Sbarro. 11-ER-2933-37. She also suffers from anxiety, panic, and obsessional memories. *Id*. at 2873.

Perez described herself as paranoid and she displayed erratic tendencies for the jury. 5-ER-1239. For example, mid-testimony she lashed out at a member of the audience for "laughing" at her. *Id*. at 1161-62. The district court, with full view of the gallery, confirmed nobody was laughing. *Id*. This prompted an exchange concerning a similar incident in her deposition. 6-ER-1363-70. Perez gave a rambling response and attributed her behavior to, in part, her astrological sign. *Id*. at

1369. Other percipient witnesses testified to Perez's mood swings and similar volatile behavior. *E.g.*, 7-ER-1811-12. Perez's performance at trial reinforced how others described her.

Perez's immigration status was interjected into this case when she claimed that it was used by Ceballes to leverage her for sex. Perez, who is from Mexico, came to United States without authorization in 2003. 6-ER-1340, 1390; 11-ER-2812. While, at her counsel's prodding, Perez testified that she has received her green card, 5-ER-1176-77, it came out over the course of trial that was untrue. At one point during proceedings outside the presence of the jury, the district court expressed concern that there was a "fraud on the court" and reserved the issue for post-verdict, if necessary. 10-ER-2709; 11-ER-2905-11. Thus, Perez maintained an immigration-related motive to fabricate her story, even at trial.

### *Perez claimed she was constantly mistreated and abused*

Separate and apart from Sbarro, Perez demonstrated a strange pattern of accusing co-workers of mistreating her while simultaneously complaining about not receiving enough hours at her jobs. This odd combination of complaints mirrored those at Sbarro and likely raised the jury's collective eyebrow.

Prior to Sbarro, Perez worked at McDonald's and accused her manager, who was a female of Mexican ancestry, of discriminating against her and of not providing her with enough hours. 6-ER-1372. Perez worked at Metro Pizza but left because

she was unsatisfied with her hours. *Id*. at 1377. At Del Taco, Perez claimed her manager exploited her immigration status and sexually assaulted her. *Id*. at 1374-75; 5-ER-1099-1100. Perez allegedly reported her manager to human resources, using both a card and a poster that had the representative's contact information on it, after this single incident. 6-ER-1374-76; 5-ER-1100-01. Perez claimed her manager was fired as a result. 6-ER-1377. Perez would later tell a Sbarro co-worker that she had in truth gotten her Del Taco manager fired for cutting her hours, not assault. 8-ER-2138.

Perez took a job at Little Caesars after leaving Sbarro, 6-ER-1378, a curious choice given she reported she was trepidatious of pizza establishments and walk-in coolers post-Sbarro. 11-ER-2865-66. In any event, she left Little Caesars because she was again unsatisfied with her hours. 6-ER-1378.

Perez then worked at The Cleaning Authority. *Id*. She used the same fake social security number to obtain employment there as she did at Sbarro and other places. *Id*. at 1382. Perez left The Cleaning Authority because she claimed her boss mistreated and "exploited" her. *Id*. at 1387; 2-SER-275.

After leaving The Cleaning Authority she obtained a job at Spotless Cleaning, however left after one day because she claimed her female co-workers mistreated her. 6-ER-1388-89. Perez then worked at Motel 6 but lasted only a week before

quitting because she felt Motel 6 "exploited" her. *Id*. at 1390-91. She then went to work at another pizzeria but quit after three days. *Id*. at 1391-93.

### *Perez committed fraud and perjured herself to obtain employment at Sbarro*

To obtain employment Perez would typically use a fake or stolen social security number and lie concerning her eligibility. *Id*. at 1371-82. She did this repeatedly over the years as she hopped between jobs, *see id*., including at Sbarro.

Perez and several family members visited the Sbarro at the former Monte Carlo Hotel food court in 2016, looking for employment. 6-ER-1431-32. As was her practice, Perez used a fake social security number that was obtained by her boyfriend, Jose Lopez, to apply. *Id*. at 1437-39. She falsely represented on her application that she was legally authorized to work in the United States and that the information she provided was accurate. 6-ER-1440-42; 2-SER-137.

Perez was also required to fill out an I-9 as part of the hiring process. 10-ER-2612-13; 1-SER-83. This is a document provided by the Department of Homeland Security and required of all U.S. employers. 10-ER-2613. Perez again provided a false social security number and alien registration number, and attested under penalty of perjury that she was a lawful, permanent resident of the U.S. *Id*. at 2614-16; 6-ER-1437-38; 1-SER-83. She did so with awareness that federal law provides for imprisonment and/or fines for false statements or the use of false documents in connection with completing the form. *Id*.

For its part, Sbarro relies upon the representations an applicant makes under penalty of perjury in making its hiring decisions. 10-ER-2616. In fact, the law prohibits Sbarro from asking for proof of citizenship apart from what the applicant provides so long as they "reasonably appear on their face to be genuine." *Id*. at 2616-18. Sbarro also contracts with a third-party that conducts background checks on applicants. *Id*. at 2667. Sbarro's vendor ran Perez through its system and confirmed that she "meets requirements." *Id*. at 2691-93; 2-SER-139. This background check combines with an applicant's attestations under oath to give Sbarro comfort that an applicant is legally permitted to work. 10-ER-2693-94. As it pertains to Perez, Sbarro did not know otherwise, *id*., and **Perez confirmed that she did not discuss her immigration status with Ceballes at any point during her employment**. 5-ER-1114. Despite that admission, Perez's theory at trial was that Ceballes leveraged her undocumented status to quietly abuse her.

### *Perez agrees that her hours are variable*

The Sbarro employment application warned Perez that she may be required to work an uncertain schedule, which she accepted upon hire. 6-ER-1441. Shifting schedules to fit the needs of one store or another is the "nature of the business" in the fast-food industry. 10-ER-2612. This would play out when Perez was transferred to another Sbarro location and, later, when her shift changed after her daughter

complained about working with her. Notwithstanding, Perez claimed this was retaliation.

### *Perez and Ceballes begin a secret affair*

Perez started working at Sbarro's Monte Carlo location in April 2016 as a food preparer, cleaner, and cook. 6-ER-1513. Ceballes was one of her several managers. *Id*. at 1584. Among others, her co-workers included Efrain Hernandez and Jesus Alatorre. 5-ER-1115. Perez claimed Alatorre and Hernandez began harassing her and that, when she complained to Ceballes, he did the same. 6-ER-1443-44. Perez testified to conflicting periods in May, June, and July 2016 during which this allegedly began. *Id*. Ceballes, Hernandez, and Alatorre were named as defendants in the amended complaint, but Perez proceeded to trial only against Ceballes.

Alatorre was not deposed and did not testify at trial. Hernandez testified and denied Perez's allegations. At the time of trial Hernandez was 32 years old and had worked at Sbarro since he was 16. 7-ER-1869. He had been married since he was 19, had three children, and worked two jobs for a decade. *Id*. at 1870; 8-ER-1899. His wife frequently visited him at Sbarro to have lunch together in the food court. 8-ER-1908. He presented as a quiet, unassuming, hardworking young family man who liked to keep to himself and whose hobbies including keeping fish tanks. 7-ER-1871; 8-ER-1920, 1923, 1933.

Hernandez did not say or do anything inappropriate to Perez and did not see or hear Ceballes or Alatorre do anything, either. 8-ER-1899-1907. While he did walk in on Perez smoking methamphetamine and filmed her doing so, she "begged" him to delete it, which he did, because he "didn't want problems with anyone." *Id*. at 1895-98. At one point Perez tried to insinuate that Hernandez was lying out of loyalty to Sbarro, to which he smartly quipped, "If [Sbarro] was my family, I wouldn't be [] working two jobs." *Id*. at 1926.

Ceballes testified that his relationship with Perez was consensual. For the first couple months of Perez's employment, there was nothing between them beyond a normal work relationship. 9-ER-2321-22. Towards the end of June 2016, the relationship began to change as Perez started directing flirtatious comments and body language towards Ceballes. *Id*. at 2322-23. Moving into early July 2016, Perez began sharing stories of a sexual nature with him, in particular that she enjoyed giving oral sex to her partners. *Id*. at 2323-26. Perez told Ceballes she was single. *Id*.[1] At one point Perez told Ceballes that she had a "good cookie," in reference to her vagina, to which Ceballes responded, "maybe one day, I'll try it." *Id*.

A few days later, Ceballes and Perez were working the back of the house together, side-by-side. *Id*. at 2327. Perez placed her arm on Ceballes' shoulder and

---

[1] This was untrue as Perez was still married to Ramos and had a live-in boyfriend in Lopez.

let it linger for a moment longer than normal and rubbed him in an affectionate manner. *Id*. at 2327-28. Ceballes took Perez's verbal and physical indications as a romantic invitation at that point. *Id*. at 2328-29.

The first time Ceballes and Perez had sex, Ceballes gathered a condom, a wet towel for "clean up," and a plastic bag to discard these materials post-coitus. *Id*. at 2329-31. Ceballes went into the cooler with the towel in the bag and the condoms in his pocket, dropped them off, and walked back out to ask Perez to come with him into the cooler. *Id*. at 2334-35. Ceballes went in first and Perez followed, closing the door behind them. *Id*. at 2335-36. Ceballes kissed Perez and she kissed him back, which he described as a "passionate" and "French kiss." *Id*. at 2336-37. Ceballes placed one hand on Perez's buttocks and the other on her waist, which he moved up to her breast and under her shirt. *Id*. Ceballes began kissing her breast and her neck, and Perez moaned pleasurably in response while kissing Ceballes' neck. *Id*. at 2337-38. Ceballes began rubbing Perez's vaginal area, outside her pants, and Perez held her arm around his waist, continuing to moan. *Id*. at 2338-39. Perez was a full and willing participant and gave no indication that the interaction was unwelcome, and the pair continued. *Id*. Ceballes unbuttoned her pants – which were "skinny jeans" – and Perez helped remove them. *Id*. at 2339. Perez asked if Ceballes had protection. *Id*. at 2340. Ceballes pulled down her underwear, Perez turned around, bent over, and braced herself on a shelf. *Id*. at 2340-41. The pair began having intercourse and

Perez continued moaning pleasurably. *Id*. at 2342. They finished, Ceballes used the towel to clean up, placed it and the condom in the plastic bag, Perez pulled her underwear and pants back up, and they exited the cooler. *Id*. at 2342-43.

The pair staggered their exits out of the store "so no one sees us together," with Perez going to the restroom first and Ceballes following to dispose of the bag and clean up. *Id*. at 2345. This Sbarro location was in a food court, so they had to use the casino's public restroom. *Id*. at 2346. They used the back exit and passed others, including security. 8-ER-1890.

Perez did not indicate that she did not want to have sex again; she did not act any different at all. 9-ER-2346-47. To the contrary, the pair repeated this same routine – in the walk-in, with the "clean up materials," and the staggered exit – an additional twenty or more times over several months. *Id*. at 2347-48; 6-ER-1303. On some occasions, they would play music on Perez's phone. 6-ER-1321-22. At times, they would try different positions, including Perez facing Ceballes, holding his waist, and propping her leg up on things nearby. 9-ER-2348-49. She never resisted, never indicated it was not consensual or unwelcome, and was otherwise engaged and relayed her enjoyment. *Id*. at 2349-50.

On one occasion, Ceballes asked her to meet him in the cooler and Perez responded that she couldn't this time because her "cookie was sick." *Id*. at 2350-51. Perez explained that meant she was on her period. *Id*. Perez offered to give Ceballes

oral sex instead, recalling her confession to him that she enjoyed it. *Id*. at 2323-24, 2351. They did so in the office area, which was out of view from the workers in the front. 6-ER-1320. Perez sat a chair while Ceballes stood. 9-ER-2356. Ceballes would unbutton his pants and Perez would take his penis out as he was not erect. *Id*. at 2357. Ceballes would not wear a condom during oral sex and when he ejaculated, he would pull away from Perez and do so in his hand. *Id*. at 2358-59. They followed the same routine with respect to the towel, bag, cleanup, and staggered exit to the casino bathroom, past security, to avoid detection by their co-workers. *Id*. at 2360-61. They had oral sex approximately a half-dozen times in addition to the twenty-plus instances of intercourse over a roughly five-to-six-month period. *Id*. at 2363-65; 6-ER-1317-18. These interactions primarily occurred when the pair worked the 6:00 a.m. shift, which was lightly staffed and had few customers, making it easier to keep their relationship hidden. 9-ER-2351-54.

Ceballes, who has been married for more than 20 years and has children, is an admitted adulterer and wished to keep this affair secret. *Id*. at 2312-13, 2331-34. Perez did too, as she lived with her boyfriend, Lopez, at the time. 6-ER-1430-31. And she successfully did so. Perez testified that on one occasion her co-worker, Alatorre, pinched her nipple so hard it became deformed, and that after work she would go home and burn herself with water. *Id*. She claimed she was depressed, relapsed, and began using methamphetamine again. *Id*. Yet Perez admitted she did

not tell her live-in boyfriend about any of this and that he never noticed anything was wrong. *Id*. Perez's testimony in this regard strongly supported Ceballes' characterization of a consensual affair that she, too, wished to keep secret.

Their relationship ended in mid-December 2016, Perez transferred to the Sbarro location at Bally's in January 2017, and the two never saw one another again (discussed below). *Id*. at 1443.

### *Sbarro's human resource policies and contact information were available to Perez, and she could report a complaint if she felt harassed*

Perez understood *before* working at Sbarro that if somebody acted inappropriately towards her in the workplace, she had the right to complain and knew how to do so. 6-ER-1374-77. After all, she claimed she had done just that at Del Taco. *Id*. Like Del Taco, Sbarro had posters up that listed the contact information for human resources, including telephone numbers, emails, and a 24/7 hotline. 9-ER-2200, 2402-05, 2454; 2-SER-288-90. Manager Jorge Garcia confirmed that the posters were "always" on display and that he instructed new hires how to contact HR. 10-ER-2580-81. Manager Alda Cadacio likewise testified that the posters were up when she worked at the Monte Carlo location. 8-ER-2055. Outside investigator Malani Kotchka testified they were present when she visited as part of her investigation. 9-ER-2200-01. Ceballes confirmed they were up while Perez worked there. *Id*. at 2366; 9-ER-2402-03. The Director of Operations for the Las Vegas area,

Larry Minister, conducted unannounced site visits and confirmed the same. 9-ER-2405. Senior Vice President and Chief Administrative Officer Rohan Shearer reviewed the inspection logs for the Monte Carlo and agreed. 10-ER-2602. HR Director Dana Dorado likewise confirmed that the posters were up at each Sbarro store. 9-ER-2454. The only person who claimed otherwise was Perez.

Similarly, Sbarro had written policies and procedures against sexual harassment, discrimination, and retaliation, which included this same human resource contact information. 10-ER-2621-29; 2-SER-91-136.

Perez was free to contact any manager, human resources, or her regional director with any concerns at any time. 10-ER-2626-32. Perez also worked with six managers and a shift supervisor at the Monte Carlo, other than Ceballes. *Id*. at 2629-30.[2] Perez worked a total of 296 shifts with a supervisor other than, or in addition to, Ceballes, to whom Perez could have reported harassment at any time. *Id*.

She admittedly did not, though she claimed she told manager Jorge Garcia that Ceballes grabbed her by the arm and put her down on the ground but that Garcia said nothing in response. 5-ER-1129-30.[3] Garcia took the stand and refuted Perez's account. He testified that he never witnessed Ceballes, Hernandez, or Alatorre ever

---

[2] A transcription error lists Brooks twice, to the exclusion of Sarmiento.

[3] Even then, she did not claim that she mentioned anything to Garcia about their sexual encounters.

act inappropriate to Perez, and that she did not ever tell him anything about Ceballes. 10-ER-2576-80. If she had, he would have reported it. *Id*. at 2578.

### *Perez transfers to Bally's*

By mid-December 2016, Perez was not getting along with co-workers at the Monte Carlo Sbarro, 9-ER-2382-84, a theme across her employment history. Ceballes contacted the manager at the Sbarro in the Bally's Hotel and Casino, Sheldon Stern, who had a need for a food preparer/cook. *Id*.; 8-ER-2100. Perez transferred to Bally's in early January 2017, and she never saw Ceballes again. 6-ER-1336, 1443.

Perez's job duties remained the same. *Id*. at 1513-14. She received a slight *increase* in pay. 11-ER-2920-21. She kept the same job title, was never demoted, was never entitled to, or denied, a promotion, and did not have a change in benefits; she suffered no adverse employment action. *Id*. at 2921-25. She would continue to work a day shift until months later when her daughter, Karla, complained and demanded her mother change shifts. 8-ER-2103-04, 2122, 2127; 9-ER-2231. Following this complaint, Perez was switched to graveyard at Bally's in mid-March 2017, three months after she last saw Ceballes. *Id*.

Shortly after her transfer, Perez took pictures of posters at Bally's that had Dorado's name and contact information on them. 6-ER-1444-45; 2-SER-288. Perez

testified that she took those photographs in case she needed help with her schedule and hours. 6-ER-1446-49. She did nothing with this information for months.

### *Perez makes contact with Sbarro's HR twice, but neither are about alleged sexual assault or harassment*

The first time that Perez reached out to human resources about *any* concern was **March 9, 2017**, when she called HR Director Dorado. 9-ER-2453. This is nearly three months after Perez last saw Ceballes. Even then, it was not about the claims in this lawsuit.

Perez called Dorado's personal cell phone, which is posted on the Sbarro "Open Door Posters" in all stores. *Id*. at 2454. Perez was upset because her Bally's manager, Stern, had reduced her hours. *Id*. Perez told Dorado she was unsure why Stern had done so, and Dorado responded that she would contact Stern to see if she could get Perez more hours. *Id*. at 2455. Dorado asked Perez if there was anything else she could assist with, to which Perez responded, "there's a lot of problems at the Monte Carlo." *Id*. When Dorado asked for details, Perez initially responded that there were "just a lot of problems" before clarifying that she thought people at Monte Carlo were stealing. *Id*. Perez would not provide *any* additional detail. *Id*.

Dorado thought it may help Perez recall who was stealing what at the Monte Carlo if she was able to write it down. *Id*. at 2457. Dorado told Perez she would e-mail her a form which Perez could fill out, and Dorado would start an investigation

into the theft allegations. *Id*. at 2456. Asking a complaining employee to fill out an investigatory form is common practice at Sbarro because it provides HR with the "who, what, when, where, and why" to begin their follow up. *Id*. at 2460. Perez provided Dorado with her e-mail address, said there was nothing else Dorado could help her with, and thanked Dorado. *Id*. at 2456.

On this March 9, 2017, call, Perez did not mention a word about sexual assault, inappropriate comments or touching, the walk-in cooler, a lock, Hernandez, Alatorre, Ceballes, or rape; she was concerned solely with getting Dorado's help increasing her hours at Bally's. *Id*. at 2458-59. While Perez frequently referred to her alleged lack of English skills at trial to explain away inconvenient facts,[4] Dorado confirmed that this March 9 call took place in English, the two had no trouble communicating, and Dorado (who is fluent in Spanish) could have switched to Spanish had there been any indication it was desired. *Id*. at 2459.[5] Dorado emailed

---

[4] *E.g.*, 6-ER-1460, 1572-73.

[5] No witness testified that they had trouble communicating with Perez in English. In fact, during direct, Perez understood her counsel's questions in English and answered them in English, oftentimes cutting off the interpreter. *See*, *e.g.*, 5-ER-1105-26. She did this for an extended period before her counsel asked for a break, after which counsel instructed Perez to switch back to Spanish. *Id*. at 1126. She almost immediately forgot and reverted to English before catching herself. *Id*. at 1127. Even then, she could not help it and testified in English repeatedly. *See*, *e.g.*, *id*. at 1136-38, 1143-51, 1155-59, 1176-78, 1185-88, 1191-92, 1201-05, 1219, 1224-25, 1228-29, 1237, 1242; 1269, 1273, 1279; 6-ER-1290, 1302, 1321, 1326-28, 1335-36, 1341-46, 1354-55, 1357, 1367, 1373, 1378-79, 1381, 1388-91, 1394-95, 1402, 1430, 1446, 1464; 1540-41, 1564, 1568-69, 1573, 1579; 12-ER-3152. She also

the investigatory form to Perez the following day, asked Perez to be as detailed as possible, and invited Perez to call her if she had any questions. *Id*. at 2461-62; 2-SER-140-42. Perez did not respond. 9-ER-2462.

As promised, Dorado followed up with Stern. *Id*. Stern took Perez off schedule because she was unreliable, would call off, would come in late, and he only had so many hours to give during March Madness. *Id*. at 2463. Dorado asked Stern to give Perez more hours and he agreed. *Id*.

Dorado received a call on her personal cell phone from Perez a week later, **March 16, 2017**. *Id*. Perez told Dorado that Stern was upset with her because she had to leave work early. *Id*. Dorado responded that she was not surprised given she had just asked Stern to give Perez more hours. *Id*. at 2464. Perez became angry and changed her story. She told Dorado that she was pregnant and needed to go to the doctor, to which Dorado responded that she was sure Stern would be understanding of an emergency. *Id*. Perez did not respond or raise any other complaints. *Id*. at 2465-66.

Dorado asked if Perez had received the investigatory form she sent a week prior, which Perez confirmed she had but had "not gotten to it." *Id*. at 2466. Once again, Perez did not mention a single word about sexual harassment or assault,

---

confirmed to the immigration court that she is fluent in English. 6-ER-1505; 1-SER-60.

inappropriate comments or touching, a walk-in cooler, a lock, Hernandez, Alatorre, Ceballes, rape, or the Monte Carlo. *Id*. at 2466-67. And once again, this conversation took place in English, there were no communication issues, and Dorado would have switched to Spanish had there been any indication it was needed or desired. *Id*. at 2468-69. Dorado did not hear from Perez – or anything related to her – for more than a month. *Id*.

### *Perez gets into an argument with a co-worker who she believes came between her and Ceballes*

Nancy Teran had been one of the managers at the Monte Carlo Sbarro while Perez worked there. 9-ER-2351. At one point, Teran was promoted to shift manager. 8-ER-2097. Perez had been there longer and felt she deserved the promotion, which led to her starting an argument with Teran. *Id*. Ceballes had to pull both Teran and Perez outside and speak with them but was unable to get Perez to stop arguing. *Id*.

Perez's niece, Aida, worked at Sbarro and, during its investigation into Perez's NERC complaint, told investigators that Ceballes "had a thing" with Perez and Teran at the same time. *Id*. at 2116-18. Aida also told investigators that Perez characterized her relationship with Ceballes as "fucking buddies" and so Perez disliked Teran because she came between them. *Id*.

On April 15, 2017, one of the Bally's Sbarro shift supervisors, Suzy Reyes, got married, and Stern gave several employees the night off to attend the wedding.

*Id*. This required him to pull workers from other stores, one of whom was Teran from the Monte Carlo. *Id*. At one point during her shift, Perez saw Teran and Cadacio speaking to one another and, out of the blue, confronted them and accused the pair of "talking shit" about her. *Id*. at 2021-23; 2126. They were not. *Id*. at 2023. Perez refused to calm down, called Teran and Cadacio "fucking bitches," and challenged Teran to step outside to fight. 8-ER-2021-23. Teran was pregnant and in her third trimester. *Id*. at 2024. Perez went home that evening and told her niece, Aida, about her friends-with-benefits, Ceballes, and how she believed Teran had wedged between them. *Id*. at 2118. Again, this was on Saturday, April 15, 2017, an important date in the timeline.

### *Perez goes to NERC and, on NERC's advice, files a police report*

The following Monday, Perez went to the Nevada Equal Rights Commission ("NERC") and provided information on an intake form used to create a charge of discrimination. 7-ER-1774. Perez returned the following day, April 18, 2017, and signed her NERC charge. *Id*.; 1-SER-36-39. Though she would later claim Sbarro facilitated her systematic rape and abuse, she initially sought reinstatement as a remedy. 3-ER-667. Somebody at NERC coached Perez to file a police report "because it could help [her] case." 6-ER-1473.

The following day, on NERC's advice, Perez visited the Las Vegas Metropolitan Police Department and filled out a report. *Id*.; 1-SER-48-51. Nowhere

in Perez's report did she claim that Ceballes threatened her with deportation or that he threatened to rape her family members if she spoke up. 1-SER-48-51; 6-ER-1475. When pressed on these seemingly material omissions that would appear in her lawsuit as justification for her nearly year-long silence, Perez blamed the police because "nobody spoke Spanish" at the Martin Luther King location at noon on a weekday, including one of the Hispanic officers with whom she met. *Id*. at 1474. The police did not arrest, bring charges, or even interview those Perez accused of raping and assaulting her, another nugget the jury likely considered in evaluating Perez's credibility. 8-ER-1906.

### *Perez notifies Sbarro for the first time, Sbarro immediately investigates, but Perez refuses to cooperate*

*After* signing her NERC charge on April 18th, Perez left a voicemail that same day on Sbarro's 24/7 HR hotline in which she mentioned, *for the very first time*, "sexual harassment." 9-ER-2427, 2469; 10-ER-2633. Even still, it was almost in passing, as her chief complaint was again about her hours. 1-SER-89; 2-SER-143. This voicemail was forwarded to HR Director Dorado that same day. 9-ER-2470. As detailed above, Dorado had spoken to Perez twice by this point – the most recent conversation having occurred over a month prior – and on neither occasion did Perez mention sexual harassment or anything similar. *Id*. at 2472-73. Dorado immediately reached out to Perez. *Id*. at 2473-75; 2-SER-140-42. Dorado – who lived in Colorado

– then called the Director of Operations for the Las Vegas area, Larry Minister, and asked him to meet Perez in person to get details. 9-ER-2475. Minister was unable to do so because of what happened next. *Id*.

On April 20, 2017 – two days after Perez left the voicemail, but before Sbarro had even received the NERC charge – Sbarro's Rohan Shearer received a call from Kara Jenkins, NERC's head administrator. 10-ER-2644-46. Jenkins "was very accusatory and her first words" to Shearer were "have you fired these three employees yet?" *Id*. Shearer – who had been in human resources for 25 years – found it "really odd" and "strange" that Jenkins, who was the head of the agency, personally called him and had "already come to a conclusion," given Sbarro had not received Perez's NERC charge and nobody, NERC included, had investigated yet. *Id*. Shearer testified that "this never happens." *Id*. Jenkins sent Shearer a follow up email in which she thanked him for his "prompt response," but even then, Jenkins had the details wrong despite her preordained conclusion. *Id*. at 2646-47; 1-SER-70. Shearer turned the complaint over to legal counsel. 10-ER-2647.

Sbarro took immediate action. Within three days of Perez's charge, it hired outside investigatory counsel from Ohio, David Axelrod, as well as local investigatory counsel, Malani Kotchka. 10-ER-2545. Together with HR Director Dorado, these three would constitute Sbarro's investigatory team. 8-ER-2073-74.

Sbarro flew Axelrod and Dorado to Las Vegas and the team began arranging and preparing for interviews. 9-ER-2479.

Kotchka, who has been an employment attorney for more than four decades and conducted "well in excess" of 100 investigations, testified at trial concerning Sbarro's investigation. 8-ER-2090. To prepare, the team obtained Perez's NERC charge, reviewed various documents, went over work schedules, prepared a list of interview questions, strategized on how best to memorialize the interviews, arranged for a Spanish interpreter, and began setting up interviews to occur on May 7 and 8, 2017. *Id*. at 2074-76. The Sbarro team scheduled Perez first and offered for NERC to be present, which NERC declined. *Id*. The team decided that Kotchka would primarily take notes of the interviews so that Axelrod would be free to focus on asking questions. *Id*. at 2078-79; 2-SER-144-224. Kotchka then had her office type her handwritten notes. 8-ER-2079; 2-SER-225-270.

It is typical, and important, to interview the complaining party first to obtain their version of events and necessary baseline details. 8-ER-2083. The first interviewee scheduled was thus Perez. *Id*. at 2082. Dorado told Perez she could bring somebody for support. *Id*. at 2084; 10-ER-2488. Yet the morning of, Perez no-called, no-showed. 8-ER-2082. Dorado called Perez and left a voicemail, again offering to allow Perez to bring a support figure. *Id*. at 2084-86. Perez called back around noon and told Dorado she had overslept and couldn't come in at that time. *Id*. Perez also

- 26 -

told Dorado she had an attorney, Hardeep ("Dee") Sull, so Dorado asked her to have her attorney call Sbarro's to help schedule the interview. *Id*. Axelrod called Attorney Sull twice and left messages, but she never called back. *Id*.; 10-ER-2549. Dorado herself tried at least three times to get Perez to show, to no avail. 8-ER-2085. During this same period, Axelrod received a call from another attorney, Jeff Pitegoff, who said he had also been retained by Perez, that he instructed her not to come back to work, not to talk to Sbarro, and that he felt interviewing Perez concerning her own complaint was "continuing the sexual harassment." *Id*. at 2088. Perez ultimately refused to be interviewed as part of Sbarro's investigation of her own claim.

Notwithstanding Perez's refsual to cooperate, Sbarro conducted 16 interviews across these two days, including Ceballes, Hernandez, and Alatorre twice, each. *Id*. at 2079-82. Kotchka and Dorado testified at length about those interviews as well as the site visits conducted. The takeaways were that (1) Ceballes denied having a sexual relationship of any kind with Perez; (2); no other witness substantiated Perez's NERC charge; and (3) Perez and her counsel refused to speak with investigators to provide her version of events.

Lead NERC investigator Darrell Harris testified that Sbarro's response to Perez's complaint was prompt and ideal in a perfect world. In fact, it was the most prompt and thorough response Harris had ever seen. 7-ER-1789, 1802-03.

***NERC finds "no corroboration" for Perez's charge of harassment but still issues***

***a partial cause finding***

NERC conducted its own investigation upon which Perez relied, yet that fell apart at trial. Harris admitted to the jury that **not a single witness corroborated Perez's allegations**. *Id*. at 1823. Despite a complete lack of corroboration, Harris issued a cause finding on Perez's claim of harassment because Cadacio supposedly told him that Ceballes had "sexually harassed" Cadacio at one point. *Id*. at 1863. Thus, Harris assumed, if Ceballes "harassed" Cadacio, then he probably repeatedly raped Perez. This illogical leap was inconsistent with Harris' own admission that Cadacio expressly did not corroborate Perez's allegations. *Id*. at 1813. Even still, Cadacio directly refuted this claim, testifying that the so-called *verbal* "harassment" was *not* harassment but was instead joking banter between her and Ceballes as co-managers, not something she felt she needed to bring to HR. 8-ER-2033, 2056. Thus, the jury heard testimony demonstrating conclusively that Sbarro had conducted a prompt and thorough investigation, that NERC issued a cause finding with no supporting evidence, and that no witness backed Perez's version of events.

***Perez shares her desire to "get her papers" and win money***

Immediately after filing her NERC charge, in the few days leading up to her quitting, Perez told multiple co-workers that she "can't wait to get my papers out of this," referring to her immigration status, that she was going to get money from

Sbarro, and that she was going to get everyone fired. 8-ER-2098, 2124-25, 2129, 2134; 10-ER-2556.

At one of her post-Sbarro jobs, The Cleaning Authority, Perez once again failed to get along with her co-workers and made the same reference. At one point she told the owner, Spencer Diller (who she also accused of "exploiting" her), that she was going to win a lot of money in a lawsuit, buy his company, and fire everyone who wasn't nice to her, a pattern of behavior displayed for the jury. 10-ER-3735-37; 2-SER-271-75.

### *Perez gets arrested and held on immigration violations*

On October 6, 2018 – while NERC was preparing its findings – Perez was arrested for domestic violence and incarcerated. 6-ER-1394; 15-ER-4262. Perez had gotten into an altercation with her boyfriend, Lopez, and battered him. While the basis of her arrest was kept from the jury, 15-ER-4165-68, she blamed Lopez and the police; it was yet another instance in a pattern of self-victimization and refusal to accept responsibility for her own actions, a theme at trial.

Due to her immigration status, Perez was incarcerated at the Henderson Detention Center from October 11, 2018, to May 23, 2019. 9-ER-2266-69. She regularly met with a clinical social worker, Ronni Musumeci. *Id*. Perez confided in Musumeci that she felt her arrest was a good thing so that she could make necessary

changes in her life. *Id*. at 2271-74.[6] Perez shared her long history of abuse and addiction, with methamphetamine dependence dating back to 2006. *Id*. at 2276-77. Perez told Musumeci she was still addicted to meth as of her arrest in October 2018 and was, in fact, high when she was arrested. *Id*. at 2277-78.

Perez told Musumeci during their very first session that she was facing deportation and was worried. *Id*. at 2279. Perez's concern of possible deportation was a recurring theme throughout her incarceration, and Perez reported feeling depressed, anxious, worried, and unable to sleep because of it. *Id*. at 2279-81. Perez told Musumeci that she had a lawyer and that her lawyer was trying to figure out how to keep her in the U.S. *Id*. at 2281. Perez also constantly complained to Musumeci about financial problems. *Id*. at 2283. Money and immigration status were the motives defendants asserted as part of their trial defense.

As their sessions went on, Perez told Musumeci that the other female inmates were continuously bullying her. *Id*. at 2285-88. Perez was repeatedly put into segregation despite her claims that she was the victim. *Id*. Perez told Musumeci that other inmates were "starting drama" with her, that the other women always made it look like Perez was the "troublemaker" when it was, according to her, the other inmates who started it, and that it made Perez "feel good" when they got in trouble.

---

[6] Though Perez told the jury she had never been arrested prior to this October 2018 incident, she confided in Musumeci that she *had* been previously arrested for possession of narcotics. 9-ER-2275.

*Id*. At the same time, Perez repeatedly told Musumeci that she did not want to continue "returning to a victimized role." *Id*. at 2290-91. Constantly blaming others was another theme at trial.

All of their conversations took place in English and Musumeci did not recall having any communication issues. *Id*.

While detained, other inmates educated Perez about a "U Visa," which could potentially allow unauthorized individuals to remain in the United States for a period if they are victims of certain enumerated crimes, such as rape, assault, or abuse. 6-ER-1480.

### *Perez files this lawsuit and later amends her complaint to include objectively false allegations of sex trafficking, which would support her visa efforts*

Perez filed this lawsuit on March 2, 2019, while still detained. 21-ER-6085. The original complaint did not name HR Director Dorado as a defendant. Perez filed an amended complaint on May 24, 2019, which added Dorado as a party. 21-ER-6028. Attorney Sull's colleague, Emma Wells, Esq., submitted a declaration with the district court in which Wells testified that she visited Perez while she was detained in the Henderson Detention Center and went over the amended complaint before it was filed. 6-ER-1497-1502.[7]

---

[7] While Perez played coy on this point at trial, it is part of the district court record. 2-SER-382-83.

Dorado moved to dismiss the allegations against her, which Perez opposed. 2-SER-361-80. In her opposition, Perez asserted that Dorado "failed to properly investigate and take action to protect a vulnerable, illegal employee, Sandra [Perez], from further abuse and rape that continued on her watch..." *Id*. at 366. Perez contended that Dorado's "actions (and lack thereof) subjected Sandra to further abuse, violence, and retaliation over an extended period of time." *Id*. Perez claimed that, "instead of rising through the ranks, [she] became an indentured servant under a new form of American sex slavery." *Id*.; *see also id*. at 378 (characterizing her own allegations as "amount[ing] to sex slavery in the workplace of an illegal worker"). She went so far as to allege that "[h]er cries for help fell on deaf ears" until NERC investigated, during which they supposedly "found for a poor, indigent, traumatized women [sic] despite the conduct of Sbarro Pizza and its agents, including Defendant Dorado, who wanted to thwart and intimidate witnesses to hide the truth!" *Id*. at 367. Perez claimed that Dorado "***refused*** to investigate outrageous and criminal conduct" and that Dorado's "unwillingness to put a stop to these egregious and inhumane conditions is, in itself, tortious and shows an agreement…with the co-Defendants that allows this type of depraved behavior to continue." *Id*. at 370-71 (emphasis in original). Leaning further into her allegations, Perez asserted that "[t]his is forced labor and sex slavery and [Dorado] tolerated, allowed and ultimately benefited from it." *Id*. Perez even lectured Dorado: "Ms. Dorado wishes to downgrade and minimize

her involvement, as anyone would, in such a disgusting and horrific account of workplace rape, repeated sexual assaults by three perpetrators, and violence in the workplace." *Id*. at 375; *see also id*. at 378 (alleging that Dorado helped cover up the alleged violence by Ceballes, et. al.).

### *Perez's counsel are personally sanctioned under Rule 11*

In response, Dorado filed a motion for sanctions under Rule 11. The district court sanctioned Attorneys Sull and Hill. In so doing, it observed that Perez's allegations against Dorado were factually impossible, even according to the timeline in Perez's own complaint. 1-SER-8. Perez alleged that she was first assaulted in May or June 2016 and that she stopped having sex with Ceballes in December 2016. *Id*. (citing amended complaint). Perez admitted that she first contacted Dorado in March 2017, but about an unrelated issue. *Id*. By Perez's own allegations, it was not until April 2017 that she reported sexual harassment to Dorado and promptly quit. *Id*. Thus, "according to the amended complaint, Meza-Perez did not inform Dorado of the alleged assaults until four months after the assaults stopped. Given this timeline, the allegations that Dorado conspired with Meza-Perez's supervisors to allow them to continue to assault and harass Meza-Perez are objectively false. Moreover, the allegations that Dorado ignored the complaints once reported were objectively false as well, as seen from Dorado's prompt follow up emails on both days that Meza-Perez made her complaints." *Id*. at 8-9.

The district court concluded that attorneys "Hill and Sull conducted no factual investigation into Meza-Perez's claims and signed a complaint asserting serious, yet factually impossible, allegations against Dorado." *Id*. at 10. As to Attorney Sull in particular, she "represented Meza-Perez during the NERC investigation, meaning she was or should have been aware of the timeline of events long before adding Dorado to the amended complaint." *Id*. The claims against Dorado "should not have been filed in the first place[.]" *Id*.

While Sbarro was precluded from introducing the fact of Rule 11 sanctions at trial, it nonetheless was permitted to – and did – examine Perez and Dorado on these false allegations, and walked the jury through the timeline just at it had the district court. Perez initially and defiantly testified that her allegations against Dorado were true before pivoting to claim she had never seen them before. 6-ER-1489-1502. When asked about her counsel visiting her at the Detention Center to review her legal documents, Perez shifted again and claimed she just couldn't remember. *Id*. During this exchange, Perez's counsel peppered the record with objections to impede the questioning. *See id*. Perez was caught before the jury in her lie.

Dorado's testimony on the topic was equally devastating to Perez. She walked through Perez's allegations in the amended complaint and opposition to the motion to dismiss, which she termed "horrific lies" that were unequivocally false. 10-ER-2491-2500.

Deciding still to pursue this dubious (and now disproven) narrative, Perez attempted to explain away Sbarro's alleged inaction by repeatedly telling the jury that they would receive evidence that the Monte Carlo store, ran by Ceballes, was a golden goose, and that Sbarro protected him in return for "blood money." 4-ER-975-86; 5-ER-988-89. These hyperbolic overpromises backfired. In reality, the Monte Carlo location ranked 130 out of 177 stores in 2016, and it was ranked 5th out of 7 Las Vegas stores. 10-ER-2648-49. It was by no means a "cash cow," and Ceballes was not integral to any perceived success. *Id*. The jury simply did not believe that Sbarro knew about and covered up sex trafficking and rape to protect a manager at a below average fast-food pizza store.

### *Perez, through counsel, evidences her intent to pursue a T and/or U Visa*

As stated, immigration played a key part at the trial for both parties' cases. Around the time she filed this lawsuit, Perez's counsel, Attorney Sull, was simultaneously pursuing relief in immigration court. Though Perez and her counsel *repeatedly* told the district court there was no evidence of this, Attorney Sull had written in an immigration pleading that "Ms. Perez is also pursuing the possibility of relief through the grant of a trafficking visa (T Visa)." 1-SER-54. And Perez's immigration expert was impeached when Sbarro played a recording of Attorney Sull telling the immigration court at a hearing that "we are working on two additional

petitions – a T Visa as well as a U Visa[.]" 2-SER-381, at 1:18[8]; 12-ER-3089-92. The parties' immigration experts confirmed that allegations of the nature Perez falsely made (i.e., sex trafficking and rape) could qualify her for these visas and delay or prevent her removal from the country. 12-ER-3136-37; 10-ER-2763-70.

## SUMMARY OF THE ARGUMENT

Perez's appeal fails for several reasons. First, her claims against Sbarro are barred by the statute of limitations thus the Court need not consider her arguments.

Second, this case boiled down to credibility determinations, which are within the exclusive province of the jury. The jury believed Ceballes' account of his relationship with Perez and rendered a verdict in his favor. In this sense, consent is the determinative issue and so the remainder of Perez's complaints against Sbarro fall by the wayside.

In that respect, this Court does not set aside findings of fact unless it is "left with the definite and firm conviction that a mistake has been committed." *Jordan v. Clark*, 847 F.2d 1368, 1375 (9th Cir. 1988) (affirming judgment denying Title VII sexual discrimination and harassment claims in a bench trial). In particular, "credibility determinations are insulated from appellate review." *Id*.; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) ("[T]he question whether particular

---

[8] Sbarro has filed a motion for leave to transmit the audio to this Court in compliance with Circuit Rule 27-14.

conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact…"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…"). In fact, the Ninth Circuit has held that, even when sitting as the lone factfinder, "the trial court's appraisal of the credibility of the witnesses is to be accepted, no challenge to such appraisal being permissible in the appellate court." *Nuelsen v. Sorensen*, 293 F.2d 454, 460 (9th Cir. 1961). Here, a ten-person jury unanimously credited Ceballes' characterization of his relationship with Perez as consensual. The jury's credibility determinations in this regard "are insulated from appellate review" and unassailable under the facts presented. *Jordan*, 847 F.2d at 1375; *Nuelsen*, 293 F.2d at 460. When considered from this basic, yet true, premise, Perez's arguments are moot.

Even then, her individual assertions of error are meritless when examined. Perez has taken a shotgun approach, claiming that nearly every disputed issue pre-trial, during trial, and post-trial was wrongly decided against her. Her position that the jury of ten and the district court got it wrong at nearly every turn in and of itself casts doubt on the legitimacy of her complaints, appropriately so.

## <u>LEGAL ARGUMENT</u>

### I. PEREZ'S CLAIMS AGAINST SBARRO ARE BARRED BY THE STATUTE OF LIMITATIONS

This Court need not consider any of Perez's arguments as to Sbarro because her lawsuit against the company was barred by the statute of limitations. A plaintiff must bring a Title VII action "within ninety days after the giving of" the EEOC's right-to-sue notice. 42 U.S.C. § 2000e-5(f)(1). The limitations period is ordinarily measured "from the date on which a right-to-sue notice letter arrived at the claimant's address of record." *Payan v. Aramark Mgmt. Servs. Ltd. P'ship*, 495 F.3d 1119, 1122 (9th Cir. 2007) citing *Nelmida v. Shelly Eurocars, Inc.*, 112 F.3d 380, 384 (9th Cir. 1997); *Scholar v. Pac. Bell*, 963 F.2d 264, 267 (9th Cir. 1992). However, where receipt is undisputed, but the date of receipt is unknown, as here, this Circuit applies a rebuttable presumption that a right-to-sue letter is received three days after its date of issuance. *Payan*, 495 F.3d at 1125; *Lee v. Venetian Casino Resort, LLC*, 747 Fed. Appx. 607, 608 (9th Cir. 2019).

The EEOC mailed Perez her right-to-sue letter on November 28, 2018. 1-SER-46-47. Perez testified that she does not know when she received it. 6-ER-1519-20. The three-day presumption from the date of its issuance therefore applies. *Payan*, 495 F.3d at 1125. Ninety days from November 28 is February 26, 2019. Applying the presumption and adding those additional three days, Perez's claims against Sbarro were required to be filed no later than March 1, 2019, i.e., 93 days from the

date of issuance of the right-to-sue. Perez did not file her lawsuit until March 2, 2019.

The statute of limitations is jurisdictional and strictly enforced, whether it be one day or one thousand days. In *Rhodes v. Raytheon Co.*, this Circuit affirmed a district court's dismissal of the plaintiff's claims that were filed one day after the expiration of the limitations period. 555 Fed. Appx. 665 (9th Cir. 2014). *Rhodes* was like this case: the date of receipt of the right-to-sue letter was unknown, the district court applied the three-day presumption, determined that the claims were filed one day late, and dismissed the case as the limitation period is strictly enforced. Accordingly, Perez's claims against Sbarro are time-barred. This Court may reject her appeal as to Sbarro *in toto* on this basis and need not consider any of her other arguments.

## II. THE DISTRICT COURT DID NOT ERR IN DENYING PEREZ'S MOTION FOR MISTRIAL DUE TO "ATTORNEY MISCONDUCT"

Perez's primary argument is that the district court committed reversible error in denying her motions for mistrial due to "attorney misconduct." Perez first references, in passing, two grounds that she never again mentions, much less supports with argument, authority, or record cites: her contentions (1) that "counsel inappropriately instructed the jurors to write things down, when it is only the Court's role to instruct the jurors" and (2) that "counsel for the defendants offered an

incorrect legal standard as an argumentative opening statement." Appellant's Opening Brief, Docket # 21 ("AOB"), at p. 11. Perez's failure to develop her arguments or support them with record cites effectively constitutes a waiver. *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("Judges are not like pigs, hunting for truffles buried in briefs" – or the record); *Rattlesnake Coal. v. U.S. Envtl. Prot. Agency*, 509 F.3d 1095, 1100 (9th Cir. 2007) ("The Federal Rules of Appellate Procedure require that a brief contain the appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies…"); *Entm't Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997) (this Court does not "manufacture arguments" for an appellant who has failed "to present…specific, cogent arguments for the court's consideration").

Even assuming this Court decides to examine these two prongs, Perez is wrong. The timeline of events in this case was critical. In opening, Sbarro's counsel told the jury, "Now, when I've completed my opening statement on behalf of Sbarro, I'm going to leave these dates sitting on the easel [referring to a demonstrative]. And you'll want to write them down because they'll be very helpful to you as the evidence starts coming in to keep track of when and what occurred." 5-ER-1037. Perez claimed doing so was "improper" but offered no meaningful explanation. 5-ER-1079-80. The district court disagreed, responding that "I'm not troubled by a lawyer

telling the jury you might want to write this down or you should write this down. I noticed they weren't all writing it down. Some were; several weren't." *Id*. at 1089, *see also id*. at 1084 ("That's…common argument of the lawyers. I'm not moved by that.").

Regarding the so-called "incorrect legal standard as an argumentative opening statement[,]" Perez fails to explain what she means. In any event, the district court noted that Perez's counsel also made statements about the law in opening. *Id*. at 1087-88. Nonetheless, the district court gave a curative instruction when the jury returned, directing them to disregard all lawyer statements about the law and informed the jury that the court would provide them with the law during deliberations. *Id*. at 1093. It is assumed the jury followed this instruction and Perez does not argue otherwise. *Doe ex Rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000) ("There is a strong presumption that the curative instructions given by the district court were followed by the jury and therefore we so presume.").

Moving to the meat of her brief, the primary instance of "attorney misconduct" Perez claims permeated the entire ten-day trial and wrongfully influenced the verdict are isolated comments by Sbarro's counsel in opening statement concerning Attorney Sull. As recapped by the district court:

> During Sbarro's opening statement, defense counsel stated the following: [P]laintiff and her attorneys led by her immigration attorney, Hardeep Sull, who's sitting at counsel's table, decided to engage in a scorched earth smear campaign. That smear campaign of false

- 41 -

allegations consisted of a relentless character assassination against [and] intimidation of Sbarro and Dana [Dorado] and especially Dana… This (indicating) is a publicly filed document filed by Ms. Sull [in which] counsel and plaintiff alleged that Dorado allowed these rapes, sexual assaults, and groping of Sandra to continue…It's now clear, a hundred percent clear -- plaintiff and her lawyers will admit it at some point -- that these public accusations were 100 percent false, demonstratively false. Counsel also stated that "plaintiff and her immigration attorney" made false allegations in this case to commit "immigration fraud" and game the system. And he stated that "plaintiff's immigration attorney led the charge against Sbarro and Dana by falsely accusing them of facilitating rape and modern day slavery," and that "plaintiff and her immigration attorney were throwing every possible argument against the wall to see what sticks in order to gain her immigration papers."

1-ER-12 (internal citations omitted).

After openings, Perez objected and made an oral motion for mistrial. 5-ER-1079-92. The district court denied it without prejudice and affirmed its pretrial ruling that Sbarro was allowed to question Perez regarding her motive and any falsities in the immigration proceeding that had not been excluded as topics by its order(s). 1-ER-12 (citing 5-ER-1080, 1085-1091). Perez then filed a written motion for mistrial or to strike Sbarro's answer. 4-ER-690-701. The district court again denied it and reiterated it would not be revisiting its motion in limine ruling that immigration evidence was relevant. 6-ER-1416-19. The district court directed defense counsel not to accuse Attorney Sull of committing fraud or to suggest to the jury that she would be taking the witness stand moving forward, which was heeded. *Id*.; *see also* 11-ER-3073 (the district court: "I've been listening carefully, and I haven't heard

the defendants accuse [Attorney Sull] any further of participation in fraudulent activities or anything like that…").

On the ninth day of trial, and prior to submitting the case to the jury, the district court again offered to give an instruction regarding Attorney Sull. 11-ER-3072-76. Perez initially indicated she wanted that instruction but later decided against it. 12-ER-3190-96, 3236. In closing, Sbarro argued that a part of Perez's motivation – particularly as it concerned making allegations against Dorado of sex slavery and the like – was to support her contemplated efforts to obtain a U or T Visa, as was represented to the immigration court on Perez's behalf by Attorney Sull. However, Sbarro did not assert that Attorney Sull was involved in immigration fraud, continuing to abide by the district court's directives. 1-ER-14.

Nonetheless, Perez re-raised her motion for mistrial, post-verdict, making many of the same arguments she had raised multiple times to the district court and those that she repeats on appeal. 3-ER-583-603. In its order denying that motion, the district court provided the above history and concluded as follows:

> Considering the ten-day trial as a whole, defense counsel's improper comments in opening did not so permeate the trial as to conclude the jury was influenced by passion and prejudice in reaching its verdict. The improper comments were made only in the opening statement. Although Sull was mentioned at points in the trial, the assertion that Sull engaged in immigration fraud was never repeated. The jury found against Meza-Perez but there was ample other evidence for the jury to base their decision on besides the references to Sull. And I twice offered to give an instruction to the jury, but Meza-Perez declined. I therefore deny this portion of her motion.

- 43 -

1-ER-14.

Federal courts have a high threshold for attorney misconduct claims. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002). The district court, having sat through weeks of evidence and argument, is entitled to tremendous deference and Perez's burden on appeal is rigorous. *Sec. & Exch. Comm'n v. Jasper*, 678 F.3d 1116, 1129 (9th Cir. 2012) ("To receive a new trial because of attorney misconduct in the civil context, defendants must meet a high standard."). For reversal "on grounds of attorney misconduct, the flavor of misconduct must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Id*.

Importantly, to the extent misconduct occurs, "[t]here is a strong presumption that [any] curative instructions given by the district court were followed by the jury…" *Doe ex Rel. Rudy-Glanzer*, 232 F.3d at 1270 (citing *United States v. Pavon*, 561 F.2d 799, 803 (9th Cir. 1977)). Among other reasons, courts seek to avoid "allowing a party to wait to raise the error until after the negative verdict." *Hemming*s, 285 F.3d at 1193. Otherwise, that party could be encouraged "to sit silent in the face of claimed error." *Id*. Although Perez did not sit silent, she chose not to accept a curative instruction that was offered multiple times. Had she accepted, she could have cured the alleged prejudice she now complains of. *Doe ex Rel. Rudy-Glanzer*, 232 F.3d at 1270. As it stands, Perez effectively built so-called error into

- 44 -

the record by rejecting a curative instruction on her primary appellate issue. The Court should not countenance this approach. *United States v. Magdaleno*, 43 F.4th 1215, 1219-20 (9th Cir. 2022) ("The doctrine of invited error prevents a defendant from complaining of an error that was his own fault."). As a result, the Court should not review the attorney misconduct issues raised.

### A.     Standard of review

Even if it does, Perez's argument still fails. This Court reviews new trial motions based on attorney misconduct for an abuse of discretion. *McKinley v. City of Eloy*, 705 F.2d 1110, 1117 (9th Cir. 1983). It does so because "the trial court is in a far better position to gauge the prejudicial effect of improper comments than an appellate court which reviews only on the cold record." *Doe ex Rel. Rudy-Glanzer*, 232 F.3d at 1270 (quoting *Kehr v. Smith Barney, Harris Upham Co.,* 736 F.2d 1283, 1286 (9th Cir. 1984)). The Ninth Circuit will disturb the district court's ruling in only limited circumstances. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 946 (9th Cir. 1993). To reverse, the Court must have "a definite and firm conviction that the court committed a clear error of judgment in the conclusion it reached." *Id.* Sbarro submits there is no such "definite and firm conviction" on this record.

### B.     Sbarro's statements in opening were not improper and were supported by the evidence

At the outset, Sbarro disputes that its comments were improper. While the district court expressed that it was "troubled" by references and "attacks" on Ms.

Sull in opening, these comments were supported by the evidence that followed and thus appropriate.

As set forth, Attorney Sull began representing Perez shortly after Perez left Sbarro in Spring 2017, including during the Sbarro and NERC investigations, in immigration court following Perez's arrest in fall 2018, and was on record representing to the immigration court that she was preparing a T or U Visa on behalf of her client. She then filed the complaints and opposition to Dorado's motion to dismiss in which she made objectively false accusations. Thus, Sbarro's statements in opening that Perez and her legal team "decided to engage in a scorched earth smear campaign" that "consisted of a relentless character assassination against [and] intimidation of Sbarro and Dana [Dorado][,]" and that "plaintiff's immigration attorney led the charge against Sbarro and Dana by falsely accusing them of facilitating rape and modern day slavery" were absolutely true and supported by the evidence. The reference to her legal team's involvement is appropriate because Perez testified that she did not see, or does not remember, what her attorneys filed. It is illogical for Attorney Sull to sign her name endorsing false allegations then claim she is unfairly mentioned when they make it to trial. The real issue here is with Perez's and her team's actions, not with Sbarro commenting on them. *Charyulu v. Cal. Cas. Indem. Exch.*, 523 Fed. Appx. 478, 480 (9th Cir. 2013) ("Plaintiff's principal argument is that the district court erred in admitting evidence that bore on

the motives of the plaintiff's counsel…Plaintiff's argument ignores the fact that in bringing the suit, Plaintiff has put in issue the reasonableness of the conduct of both sides in the litigation…There was no error.").

Moreover, several witnesses testified that Perez told them she was "going to get her papers" – or similar reference to her immigration status – from these allegations. 8-ER-2124-29, 2134; 10-ER-2556. And Perez's immigration expert agreed that the allegations contained in the amended complaint could support an application for a T or U Visa if true. 12-ER-3103-05. Further, on direct examination, Perez's counsel elicited testimony that Perez already had a green card, which was false. 5-ER-1176-77; 11-ER-2905-11. When the issue came to light, the district court expressed concern that there had been a fraud on the court. 10-ER-2709. While her immigration proceeding was still playing out – as it was during trial – she remained subject to removal, including if the immigration authorities learned that Perez had lied to them. 11-ER-2830. That turned out to be the case as Perez's Application for Cancellation of Removal (i.e., request not to be deported) and related submissions contained various misrepresentations.[9] Point being, separate from the financial incentive, Perez still had a compelling motive to fabricate her allegations at trial.

---

[9] By way of example, Perez had brought others into the country illegally, but lied about it (2-SER-283), asserted that her deportation would constitute a hardship on her spouse (who was in prison for allegedly abusing her children) which was also untrue, (*Id*. at 278; 12-ER-3110-13), and lied about her arrest history and substance

As to Attorney Sull, Perez's own immigration expert made a point to let the jury know that Perez did not sign off on these falsities, "her lawyer did it." 11-ER-3065; 12-ER-3110-14, 3123. On redirect, **Perez's counsel** furthered the distinction, eliciting testimony from her expert that the documents were signed by Attorney Sull rather than Perez. 12-ER-3147. If Perez now takes issue, then she has her own expert and counsel to blame. Regardless, the testimony backed Sbarro's statement that "plaintiff and her immigration attorney were throwing every possible argument against the wall to see what sticks in order to gain her immigration papers."

Again, while Attorney Sull takes umbrage at being referenced, she was very much involved in her client's course of action and personally signed and pursued allegations that, as the district court described, were "objectively false[.]" 1-SER-9. Attorney Sull had personal knowledge of the actual timeline of events but still made "objectively false" allegations of sex slavery and rape facilitation and stood on them after receiving a Rule 11 safe harbor letter. Sbarro's opening statements to the jury concerning Perez's and her team's desperate measures were supported. *See also* 12-ER-3194-96 (colloquy with the court discussing the issue in context of a curative instruction).

---

use. 11-ER-2832-34; 1-SER-56 (claiming no encounters with law enforcement). Attorney Sull prepared and signed this form and attested to its accuracy. 2-SER-284.

Finally, Perez takes issue with counsel's statement in opening that "[i]t's now clear, a hundred percent clear – plaintiff and her lawyers will admit it at some point – that these public accusations were 100 percent false, demonstratively false." Perez interprets this to mean that her lawyer(s) would be testifying at trial. But that was not the intent of this statement. As explained to the district court, the reference was meant to convey that Sbarro did not believe that, in closing, Perez's attorney was going to tell the jury that Dorado trafficked her client, 12-ER-3192, keeping in mind that narrative was "objectively false" per the district court and impossible by Perez's own timeline, as would be (and was) borne out by the trial testimony. In other words, an implicit admission such events did not occur.

Regardless, it is difficult to envision how this statement prejudiced Perez, much less manifestly, given a jury typically expects counsel to back up their representations, something Sbarro's counsel even pointed out in his opening statement. 5-ER-1039-40 ("Hold Dr. Foley [Perez's counsel] and me responsible for what we're promising the evidence will tell you."). If the jury did, in fact, misunderstand counsel's comment to convey a promise that Perez's lawyer would testify and admit their client lied (itself speculation), then it is not far-fetched to assume the jury would hold defense counsel responsible for not following through on the promise. *Settlegoode v. Portland Pub. Schs*, 371 F.3d 503, 520 (9th Cir. 2004) ("The sanction for making such an argument is that it may boomerang if it does not

resonate with the jury.").  At bottom, however, Sbarro did not need to call Attorney Sull as a witness; these statements were backed up by other evidence that *was* introduced to the jury.  In that regard, counsel does not need direct evidence – Attorney Sull's testimony, for example – to support a legitimate argument where circumstantial evidence and inference are sufficient. *Settlegoode*, 371 F.3d at 520 ("That Kafoury had no direct evidence supporting these arguments is of little consequence; circumstantial evidence and inference are sufficient to support a legitimate argument. Kafoury is not a prosecutor, subject to constraints and responsibilities that don't apply to other lawyers.") (quoting *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993)). Rather, "[a]s an advocate in a civil lawsuit, [counsel is] perfectly entitled to argue that the jury should disbelieve the opposing party's witnesses for any number of reasons, **including that they may have been guided by advice of their lawyers**." *Settlegoode*, 371 F.3d at 520 (emphasis added); *see also Kojayan*, 8 F.3d at 1323 ("Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers…lawyers representing private parties may - indeed, must - do everything ethically permissible to advance their clients' interests[.]") (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)). Accordingly, Sbarro submits that the opening statements were fair advocacy. *Settlegoode*, 371 F.3d at 520.

Finally, Sbarro is reluctantly compelled to address Perez's accusation that the "district court failed to account for micro-macro-aggressions against counsel," which she characterizes as an attack "against two women of color" and the "use of the dirty immigration political card[.]" AOB, at p. 17.[10] Sbarro is a diverse company founded and operated heavily by immigrants. Its founders are from Italy and its CEO is from Lebanon. 10-ER-2669-70. Its employees around the globe speak Spanish, Arabic, Bengali, Chinese, French, Italian, Portuguese, Swahili and other languages. *Id*. One of its corporate witnesses at trial, Rohan Shearer, is from South Africa. *Id*. Trial witnesses Perez, Ceballes, Garcia, and Hernandez – all of whom did or do work for Sbarro – are Hispanic. Its corporate representative at trial, Dorado, is married to a Mexican man and she uses Spanish in her household. 9-ER-2452. Sbarro's trial team included two women, one of whom is ethnically diverse. And Sbarro made clear during *the same opening statement that Perez complains of* that Sbarro has greatly benefited from the diversity of its workforce, celebrates the many contributions immigrants have made to the company, and embraces the desire of others to emigrate to the United States. 5-ER-1051-51. Sbarro made its position on

---

[10] Attorney Sull's co-counsel Dr. Foley, who is Caucasian, took all of the witnesses, did the opening, closing, and all other tasks before the jury. Attorney Sull had no speaking role in front of the jury. It is unclear, then, why Perez believes that the jury held any of this against her (silent) counsel, as her lead attorney is not an ethnic minority. Moreover, the jury was comprised of both men and women, and several ethnic minorities.

immigration clear in opening, telling the jury that, "[a]fter all, we are a nation of immigrants, and we're better for it." *Id*. And, while Perez told the jury in closing that Sbarro simply wants it to "believe that this immigration thing is a big deal," (12-ER-3366) Sbarro explained that "[t]his is not an anti-immigration issue [] [a]nd framing it as such is offensive[.]" *Id*. at 3360. Sbarro point blank told the jury: "it's an insult and it's disingenuous" and "isn't at all supported by the evidence that Sbarro is anti-immigrant. That's not what this is about." *Id*. at 3361. Rather, "[p]eople sometimes lie to support a lawsuit. It just so happens in this case plaintiff was lying about immigration issues." *Id*. The facts backed that contention up.

Perez's accusations of "micro" and "macro" aggressions about race, gender, or national origin are offensive, unsupported by a shred of evidence, were unpreserved, false, and sanctionable.

> ### C. Even assuming Sbarro's isolated statements in opening were improper, they did not rise to the level of prejudice warranting a mistrial

Even were this Court to disagree, the allegedly improper comments were few and confined only to opening statement. Because they were isolated in this ten-day trial, and because substantial evidence justifies the jury's verdict, Perez is not entitled to a mistrial.

This Court has repeatedly held that there is no basis for mistrial in such circumstances. For example, in *Kehr v. Smith Barney, Harris Upham & Co*.,

plaintiff's attorney engaged in far more egregious conduct when he "indulged in criminal imagery; commented on the financial disparity between the parties; dwelled upon irrelevant subjects; conducted himself with a lack of decorum; and made unsubstantiated accusations of tampering with documents against [defendant] and its counsel." 736 F.2d 1283, 1285 (9th Cir. 1984). The district court characterized counsel's conduct as "outrageous" (*id.*) and the Ninth Circuit had "no trouble concluding that [counsel's] remarks were improper." *Id*. at 1286. The question became "whether the instances of misconduct so permeated the trial that the jury was necessarily prejudiced." *Id*. Though "outrageous," the district court found that counsel's comments did not sufficiently prejudice the jury to warrant a new trial. *Id*. The Ninth Circuit reviewed the entire trial record and determined the district court did not abuse its discretion. *Id*. It did so in part because "the offending remarks occurred principally during opening statement and closing argument, rather than throughout the course of the trial[,]" thus "[t]hey were isolated, rather than persistent." *Id*. This Court pointed out "that the trial court is in a far better position to gauge the prejudicial effect of improper comments than an appellate court which reviews only the cold record[.]" *Id*.; *see also Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995) ("[T]he trial court is in a superior position to gauge the prejudicial impact of counsel's conduct during the trial.").

Sbarro's allegedly improper comments were isolated to opening – before the jury knew any of the players or heard any of the evidence – and the district court instructed that opening statements are not evidence,[11] sinking Perez's argument. *United States v. Rhodes*, 713 F.2d 463, 469 (9th Cir. 1983) (no error to deny mistrial where counsel's remarks occurred at the outset of a three-week trial and jury was admonished that counsel's argument was not evidence); *Sec. & Exch. Comm'n v. Jasper*, 678 F.3d 1116, 1129 (9th Cir. 2012) (no misconduct from "small number of isolated statements in lengthy closing and rebuttal arguments" that "was not of the kind or quality that would permeate the entire proceedings and taint the jury's verdict."); *Gorio v. Block*, 972 F.2d 1339, 1339 (9th Cir. 1992) (affirming denial of mistrial because "[t]he attorney's misconduct took place at the very beginning of the trial, before the jury had become familiar with the appellants; over the course of the lengthy trial that followed, any prejudicial effect would have been substantially diluted."). The allegedly improper comments were isolated and front-loaded, the record supports the verdict, and the district court did not abuse its discretion in denying Perez's motion for mistrial.

---

[11] 12-ER-3264.

### III. THE DISTRICT COURT DID NOT ERR IN RULING ON EVIDENTIARY OBJECTIONS NOR DID IT ERR IN DENYING PEREZ'S POST-TRIAL MOTIONS

Perez next argues that the district court erred in ruling on various evidentiary objections such that the cumulative effect deprived her of a fair trial. The Opening Brief is organized in such a way that it is difficult for Sbarro to concretely identify which particular evidentiary rulings Perez is challenging. As best Sbarro can discern, Perez re-raises arguments from her post-judgment motions (see AOB, at p. 24), which appear to include the following: (a) her objection to evidence regarding prior sexual history under Fed. R. Civ. P. 412; (b) the district court's admission of evidence in her immigration file; (c) the playing of an audio recording of Attorney Sull's statements to the immigration judge concerning her intent to seek a T and/or U Visa; (d) an allegedly "improper reference" by the trial judge to the "justice court" rather than immigration court; (e) an alleged violation by defense counsel of the district court's ruling on motion in limine #5, which prohibited reference to the Rule 11 sanctions; and (f) "unreasonable" trial management orders.[12]

#### A. Standard of Review

"District courts are granted broad discretion in admitting evidence, and their rulings are reviewed only for an abuse of discretion." *Ruvalcaba v. City of Los*

---

[12] If Sbarro has not captured all evidentiary objections then it reserves the right to seek leave to file a sur-reply and/or address them at argument. Sbarro disputes that the district court committed any evidentiary errors that would result in a new trial.

*Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (*citing United States v. Dunn*, 946 F.2d 615, 617 (9th Cir. 1991). That includes "broad discretion in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." *Ruvalcaba*, 64 F.3d at 1328. "A new trial is only warranted when an erroneous evidentiary ruling substantially prejudiced a party." *Ruvalcaba*, 64 F.3d at 1328. Importantly, "an error in a civil trial need only be more probably than not harmless." *Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1459 (9th Cir. 1983). "In other words, when an appellate court ponders the probable effect of an error on a civil trial, it need only find that the jury's verdict is more probably than not untainted by the error." *Id.* The result affords tremendous deference to the jury's findings and to the trial court's evidentiary rulings. With the appropriate standard in mind, Perez's arguments are unavailing across the board.

### B. The district court did not err in overruling Perez's Rule 412 objection.

Perez first contends that Defendants did not comply with Fed. R. Evid. 412 because they did not file a notice of intent to introduce evidence concerning her sexual history, in particular as it pertains to a question about Perez's relationships with her exes. AOB, at p. 24-25. Perez fails to cite to the particular portion(s) of the trial transcript she refers to, inappropriately leaving Sbarro and the Court to sift through the record for her. *Indep. Towers of Wash.*, 350 F.3d at 929; *Rattlesnake Coal.*, 509 F.3d at 1100 (requiring citation to particular portion(s) of record). Perez

appears to take issue with Ceballes' testimony concerning her sexual preferences and oral sex, as she relayed to him, elicited by his counsel. Sbarro joins Ceballes' Answering Brief on this issue for sake of brevity.

### C.   The district court did not err in admitting evidence from Perez's immigration proceedings

Perez consistently maintained that evidence concerning the status of, and representations made, in her immigration proceedings were irrelevant, even though she interjected the issue in the first place. Perez attempted to keep this evidence away from the jury through motions in limine, evidentiary objections, and trial motions. She mistakenly claimed before the district court, as she does on appeal, that her actions in immigration proceedings were irrelevant because she did not ultimately obtain a T or a U Visa. Perez continues to miss the point.

Whether Perez obtained or even applied for either visa is immaterial. 10-ER-2707 (district court acknowledging prior ruling on the issue). What matters is that Perez, through counsel, represented to the immigration court that she was preparing those visas during the same period she sued Sbarro. She then amended her complaint to include allegations of sex slavery and trafficking, which would support the visa efforts, if true. Thus, such representations in immigration court were highly relevant and probative. This issue was exhaustively raised and repeatedly ruled on by the district court in favor of defendants, and Perez cannot show that the court's decision to allow such evidence "lies beyond the pale of reasonable justification under the

- 57 -

circumstances" nor that the district court abused its discretion. *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1060 (9th Cir. 2014) (quotation omitted); *Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 514 (9th Cir. 1989) (reviewing Rule 401 objections for abuse of discretion).

> **D.** **The district court did not err in allowing the jury to hear an audio recording of Perez's counsel in which she told the immigration court that she intended to seek a T or U Visa.**

Perez argues that the district court erred in allowing Sbarro to play the audio of Attorney Sull telling the immigration judge that "we are working on two additional petitions – a T Visa as well as a U Visa[.]" 2-SER-381, at 1:18. Perez contends that playing the recording was "fundamentally unfair," (AOB, at p. 29) but once again does not elaborate on her assertion and thus the Court should disregard it. *Entm't Research Group, Inc.*, 122 F.3d at 1217; *Rattlesnake Coal.*, 509 F.3d at 1100.

Perez also claims that the "recording was improperly obtained" and she "requests an evidentiary hearing to determine how Defendants obtained" it. AOB, at p. 29-30. Yet again, Perez offers no explanation as to why she believes the recording was "improperly obtained" nor does she discuss how it prejudiced her right to a fair trial. Accordingly, this argument should likewise be disregarded. *Entm't Research Group, Inc.*, 122 F.3d at 1217; *Rattlesnake Coal.*, 509 F.3d at 1100. Even if it were not, it was properly obtained via a FOIA request, which Perez admitted. 1-ER-10.

Her passing authenticity objection fails, too. The audio was first played to the district court – outside the presence of the jury – in response to a mid-trial motion Perez made to preclude Sbarro's immigration expert from testifying, after Perez (falsely) represented that there was "no evidence to suggest that Ms. Meza-Perez has attempted to obtain or even had plans to obtain a T or a U United States visa." *E.g.*, 10-ER-2700. Attorney Sull and the district court had an exchange after it was first played and there was no dispute it is her voice. *Id*. at 2702-04. And Perez did not object to its authenticity when it was used to impeach her immigration expert. 12-ER-3089-92. To now call into question the authenticity of that recording, an issue that was not preserved for appeal, appears in bad faith. 1-ER-10.

### E. The district court's reference to the immigration court as "justice court" is immaterial.

Perez next complains that the district court indicated the audio recording of Attorney Sull was from "Justice Court, when in fact, it was from immigration court." AOB, at p. 30. She claims that justice courts "are most commonly associated with their rule of handling criminal proceedings" and implicitly concludes that the jury picked up on, and understood, that conclusion, and that it in turn prejudiced her. Perez goes so far as to blame Sbarro's counsel for not "correcting" the district court in its misstatement. Placing blame on the defense for failing to correct this immaterial mischaracterization is nonsensical; Perez and her attorneys were standing in the courtroom and had every opportunity to correct the district court themselves.

Perez did not do so, and her failure to object constitutes waiver of this issue. 1-ER-10 (showing Perez attached "no significance" to the misstatement and made "no effort" to correct it); *Saman v. Robbins*, 173 F.3d 1150, 1155 (9th Cir. 1999) (finding waiver where party failed to object at trial). Realistically, the jury likely did not understand this distinction or attribute any meaning to the district court's isolated statement, and Perez is again grasping at straws.

> **F.** **Defense counsel did not violate the district court's ruling on Perez's motion to exclude reference to the fact of Rule 11 sanctions**

The district court did not allow Sbarro to reference its Rule 11 sanctions at trial. **Perez admits in her brief that defense counsel did not do so**. AOB, at p. 33. That concession dooms this non-issue. Nonetheless, Perez contends that "Defense counsel achieved the same effect by pointing out Ms. Hill and Ms. Sull in court as often as possible throughout trial in a denigrating and accusatory manner." *Id*. Sbarro takes issue with Perez's mischaracterization of events and, certainly, the transcript does not support it. Regardless, the entirety of this portion of Perez's argument concerns references to Perez's counsel in other context. For example, Sbarro noted that Attorney Sull represented Perez during both Sbarro's and NERC's investigations and in immigration proceedings, both of which was highly relevant and at issue. 10-ER-2712 (District court: "You certainly can ask and present testimony that the plaintiff, you know, contemplated filing a T or a U [Visa] and try

to link it in the jury's mind to basing it upon the allegations here…Now, can they identify [Ms. Sull] as the voice on a transcript? Of course. That's a fact. And it's – there's plenty of evidence that she was [Perez's] immigration attorney. So you can certainly present that's what she was doing, representing her client."). There is no further reference to the Rule 11 issue, which is what the district court's order concerned, and thus this argument is wholly misplaced.

### G. *The district court managed the trial appropriately*

Perez next claims the district court abused its discretion in managing the trial with respect to timing and the order of witnesses. AOB, 35. Though she acknowledges that the district court held the parties to the low end of their own 10-12 day trial estimate, she still claims she was "prevented from telling her story in a cohesive fashion that would be easy for the jury to understand." *Id.*[13] She does not explain how, such as by describing what evidence she wanted to introduce but was unable to because of unreasonable time constraints. In truth, Perez dominated the testimony, appearing on four days. She was frequently rambling, repetitive, and nonresponsive, causing the district court and counsel – including her own – to repeatedly warn her to stay on track. *See*, *e.g.*, 5-ER-1200; 6-ER-1427. At times, Perez's counsel contributed to the issue, prompting the district court to admonish her

---

[13] The timing was clear and was discussed more than once pretrial. E.g., 14-ER-3772-73.

that cross-examination was not meant to be a discovery proceeding and she had not been "efficient or effective." 9-ER-2251.

A trial judge has the power to "control the progress and, within the limits of the adversary system, the shape of the trial[.]" *Geders v. United States*, 425 U.S. 80, 87 (1976). Fed. R. Evid. 611 *requires* the district court to exercise "reasonable control" over examination to, inter alia, avoid wasting time. *Id*. at 87 ("If truth and fairness are not to be sacrificed, the judge must exert substantial control over the proceedings."). The district court did precisely that. Perez has failed to explain otherwise, much less show the court abused its discretion in managing the orderly presentation of evidence. *Indep. Towers of Washington*, 350 F.3d at 929–30 (forfeiting appellate issues where appellant offered "little if any analysis to assist the court in evaluating its legal challenge" and left "the court to piece together the argument").

## IV.    THE JURY VERDICT WAS SUPPORTED BY THE EVIDENCE

Perez claims that the jury verdict was not supported by the evidence but, conspicuously, she did not provide to this Court much in the way of citation to trial testimony, *any* of the 63 exhibits that were admitted into evidence, or any of the material used for impeachment but that was not marked as an exhibit. In truth, the documentary and testimonial evidence was voluminous and overwhelming in defendants' favor. *See, supra*, at Counter-Statement of Facts (summarizing the

evidence adduced at trial). In sum, defendants demonstrated that Perez had a motive to lie, shared that motive with others, and advanced demonstrably untrue contentions. She did not present a single witness – including any of her own family members – to back up her version of events. Her version was squarely refuted in every respect by all other fact witnesses who testified, as well as by her own pleadings.

Appellate courts defer to the trial judge on this issue because "[d]etermining 'the clear weight of the evidence' is a fact-specific endeavor…" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (collecting cases). That said, "a stringent standard applies when the motion is based on insufficiency of the evidence." *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987). This relief may only be granted where the verdict "is against the 'great weight' of the evidence, or 'it is quite clear that the jury has reached a seriously erroneous result.'" *Id.* (quoting *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1347 (9th Cir. 1984)).

Perez and Ceballes were the only two people in the room during their sexual encounters. This was a literal he-said, she-said case, where credibility reigned supreme. Perez *admits* that "[n]either the district nor the appellate court may weigh the evidence or assess the credibility of witnesses in determining whether substantial evidence exists" to support a jury verdict. AOB, p. 37-38; *see also*

- 63 -

*Jordan*, 847 F.2d at 1375 ("credibility determinations are insulated from appellate review."); *Meritor Sav. Bank, FSB*, 477 U.S. at 68 ("[T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact…"); *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…"). This Circuit has thus held that credibility findings are immune from appellate review. *Nuelsen*, 293 F.2d at 460. Perez's admission that the district court and this Court do not second guess the jury's credibility determinations itself closes the door to this argument.

After 10 full days of trial, the jury of ten arrived at a unanimous defense verdict after working their way through a detailed verdict form given over Sbarro's objection. Perez has not and cannot demonstrate that the jury got it manifestly wrong or that the district court erred in any of its evidentiary rulings or in the management of the trial, much less show substantial prejudice warranting a new trial. Put simply, she has come nowhere near satisfying her extraordinarily high burden of demonstrating that the verdict was unsupported by the evidence and has implicitly admitted that she cannot.

## V. THE DISTRICT COURT DID NOT ERR IN GRANTING, IN PART, SBARRO'S MOTION FOR SUMMARY JUDGMENT.

The district court granted partial summary judgment in Sbarro's favor on Perez's state law claims as untimely under the applicable statutes of limitation, finding that no equitable tolling applied. 1-ER-50-70. It also granted summary judgment in favor of Sbarro on Perez's gender discrimination claim and a portion of her retaliation claim. *Id.*, at 70. *Nine months* later, Perez moved for reconsideration. 17-ER-4799-4807. The district court denied her motion both because it was untimely and, even if it was not, there remained no genuine issue of material fact that Perez's state law claims against Sbarro were time-barred. 1-SER-2-5. The district court again declined to exercise its discretion to apply equitable tolling. *Id. Five and a half months later* – on the eve of trial – Perez filed another motion to reconsider on this issue. 14-ER-3783-3871. The district court again denied it, citing untimeliness under the local rules, as it was filed "more than a year and a half later and on the eve of trial[.]" *Id.* at 3770.

Another *seven and a half months after that*, post-trial, Perez filed another renewed motion for reconsideration and clarification on the court's order entering partial summary judgment which, at that point, had been issued two and a half years earlier. 3-ER-604-609. The district court again denied that motion in its omnibus order addressing all post-trial motions. 1-ER-4. The court referred to its prior explanations and further noted that "Perez did not argue that any of her claims were

timely. Rather, she argued only that equitable estoppel tolled the limitation period. I found no equitable tolling as to Sbarro and I decline, once again, to reconsider that decision." *Id*.

Perez incorrectly argues that the district court's decision not to apply equitable estoppel as to Sbarro was reversable error. She is again wrong for all of the same reasons the district court has laid out in its prior rulings on this subject, and she offers no new argument, authority, or analysis of the issue on appeal.

Even then, any error would be harmless because the jury found that Ceballes did not commit any torts against Perez. Thus, Sbarro could not have been held liable by extension. The district court's orders on summary judgment are thus immaterial.

## VI. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ITS PRE-TRIAL OR PROCEDURAL RULINGS

Perez next contends that: (a) the district court erred in allowing one of her many attorneys to withdraw; (b) the district court erred in denying her second motion to continue the August 2022 trial date; and (c) the magistrate judge erred in denying her motion to extend discovery, as did the district court in overruling her objections to that decision. AOB at p. 45-48. She is again wrong on all counts.

### A. The district court did not abuse its discretion in allowing one of Perez's many counsel to withdraw five months prior to trial

It does not appear that allowing counsel to withdraw in a civil case can be error as, "[g]enerally, a person has no right to counsel in civil actions." *Palmer v.*

*Valdez*, 560 F.3d 965, 970 (9th Cir. 2009). That is doubly true here as Perez always had counsel in Attorney Sull. To the extent a basis to find error could lie, the Ninth Circuit reviews for an abuse of discretion. *See LaGrand v. Stewart*, 133 F.3d 1253, 1269 (9th Cir. 1998).

Perez's lineup of attorneys was a bit of a revolving door. The one constant, however, was Attorney Sull, who has represented Perez for the last seven years. Attorney Sull originally filed this case in March 2019 with her co-counsel, Melanie Hill. 21-ER-6085. The pair litigated it in tandem until attorneys John Samberg, Bradley Schrager, and Jordan Butler filed their notices of appearance in December 2019. 1-SER-18. Hill withdrew in May 2020, not long after Dorado filed her Rule 11 motion, citing in her declaration that Perez terminated her. 1-SER-15. No trial date was set at the time.

Perez continued to be represented by attorneys Sull, Samberg, Schrager, and Butler until March 2022, when the later three filed a motion to withdraw citing a deterioration of the attorney-client relationship as well as Perez insisting on taking actions that they disagreed with. 16-ER-4419-4427. At the time, trial was set for March 28, 2022. 22-ER-6153. A scheduling conference was held at which the district court vacated the trial and reset it for August 22, 2022. *Id*. at 6156. Samberg, Schrager, and Butler were permitted to withdraw. *Id*. at 6157. Jenny Foley filed her

notice of appearance as co-counsel for Perez on April 4, 2022, with nearly five months to prepare for trial. *Id*.

Perez claims that allowing Samberg's firm to withdraw five months prior to trial prejudiced the remainder of the proceeding warranting reversal. She does not explain her reasoning, nor does she cite a case that stands for the proposition that an attorney in a civil lawsuit is required to work for free and against his or her will. Perez does not even provide as part of her record excerpts the sealed opposition to which she refers. Sbarro has not been provided with that document, the withdrawal hearing was handled outside the presence of defense counsel, and counsel is thus left guessing.[14] Regardless, Perez has cited no case or rule of law supporting her argument, and Sbarro is unaware of any supporting authority. Perez's counsel had more than enough time to prepare for trial, and Perez had Attorney Sull as additional trial counsel, who represented her for seven years. No error or prejudice to Perez occurred.

### B. The district court did not err in denying Perez's second motion to continue trial.

Perez claims the district court erred in denying her second motion to continue trial, filed approximately three weeks prior to the already-continued trial. Perez cites

---

[14] Sbarro has asked for this document from Attorney Sull and received no response. It is not Sbarro's obligation to submit Perez's record.

the death of her psychological expert, Roitman, and her desire to file motions to reconsider prior rulings by the district court as grounds. Neither is persuasive.

As to the Roitman issue, Perez has dedicated a section of her brief to it. Sbarro addresses this argument in Section VII, *infra*.

Regarding reconsideration, she has cited no authority justifying relief. Again, Attorney Sull represented Perez through the entire litigation. And, Attorney Foley substituted in for Attorney Samberg's firm fully aware of the trial date and bound by it. She had five months to file these motions yet waited until three weeks prior to trial. Even then, she stated she wished to ask the district court to reconsider, for example, its order on summary judgment that was entered years prior, obviously untimely. Any so-called prejudice was self-inflicted by her own delay. Perez has shown no error or abuse of discretion.

## C. The district court and magistrate judge did not err in denying Perez's request to extend discovery.

Perez next argues the district court abused its discretion in denying her motion to extend discovery, though she again fails to offer meaningful explanation. AOB, p. 48. "The district court is given broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order . . . will not be disturbed unless they evidence a clear abuse of discretion." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992). The default discovery period in the District of Nevada is 180 days (6 months). LR 26-1(b)(1).

The court enlarged this period to 9 months in this case. 1-ER-78-79. Perez failed to take any depositions for nearly six months, failed to propound any written discovery for nearly 200 days, and failed to depose Ceballes – her most critical witness – until less than a month prior to the already-extended discovery close. *Id*. She was represented by at least two attorneys the entire time. *Id*. The magistrate judge and district court correctly determined that Perez failed to demonstrate good cause, which primarily looks to the movant's diligence or lack thereof, to justify another extension. *Id*.; *see also* 1-ER-77. In sum, Perez had sufficient time to conduct discovery and she fails to explain what additional discovery was necessary, but not completed, due to reasons outside her own control, i.e., not attributable to her own delay.

## VII. THE DISTRICT COURT DID NOT ERR IN ITS RULINGS ON MOTIONS IN LIMINE OR AS IT CONCERNED PLAINTIFF'S PSYCHOLOGICAL EXPERT, DR. ROITMAN

Perez next argues that the district court committed reversible error by refusing to postpone the August 2022 trial date to allow her to retain a new psychological expert after her prior expert, Dr. Roitman, passed away. AOB p. 48-51. Perez concedes that this issue is reviewed for an abuse of discretion.

Perez misleads. Dr. Roitman passed away on January 19, 2022. At that time, Perez was represented by multiple attorneys at two law firms – Sull, Samberg, and Butler. A week after his passing, Attorney Samberg discussed with defense counsel

that Dr. Roitman had passed and indicated that he may designate portions of Dr. Roitman's deposition rather than seek to retain a new expert. 14-ER-3916, 3920. More than two months passed, with no request by Perez to obtain a new expert, until attorney Samberg's office withdrew. The trial was reset to late August 2022, and Attorney Foley substituted in. More than three months later, and just one month before trial, Perez filed an "emergency" motion to substitute Dr. Roitman, which implicitly requested to continue the trial date to allow for more expert discovery. 15-ER-4038-4098. Perez claimed that "new counsel learned for the first time" that Roitman had passed in January 2022 during a July 14, 2022, hearing. 15-ER-4043. Perez claimed that Samberg and Butler did not inform Sull or Foley of Roitman's passing. 15-ER-4044.

Sbarro opposed, citing Perez's extreme delay in raising the issue and resulting prejudice. 14-ER-3895-3913. Perez's lawyers either made a strategic decision not to replace Dr. Roitman, as suggested by Attorney Samberg, or were negligent in their failure to communicate, as conveyed by Attorneys Sull and Foley. If the former, then "in law, as in life, do overs are a rare commodity" and a court should not "rewind the clock to alter prior counsel's mistake, or perhaps, strategic decision" in a case simply because new counsel is employed. *Pruco Life Ins. Co. v. Wilmington Trust Co.*, 616 F. Supp. 2d 201, 205 (D.R.I. 2009). If the latter, their neglect was inexcusable and Perez's claimed prejudice is self-imposed. In that respect, a party

"voluntarily [chooses their] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 (1962). And in fact, "[a]ny other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Id*. at 634 (internal citations omitted). Such imputed notice includes Samberg's and Butler's knowledge, in January 2022, that Roitman passed away. As a result, "[t]here is certainly no merit to the contention that [an adverse ruling] because of his counsel's unexcused conduct imposes an unjust penalty on the client." *Link*, 370 U.S. at 633. As instructed by the Supreme Court, "if an attorney's conduct falls substantially below what is reasonable under the circumstances, the client's remedy is against the attorney in a suit for malpractice[,]" not in the form of relief against his opponent. *Id*. at 634, n. 10.

The district court held a hearing on Perez's motion. 14-ER-3747-63. While Perez's legal team faulted one another, there was ultimately no dispute that her attorneys were contemporaneously aware Dr. Roitman died. By that point, this lawsuit had been pending for 3 ½ years. The district court considered the delay and prejudice to defendants and denied Perez's motion to substitute a new expert. *Id*. However, as a compromise – and over defendants' objections – it allowed Perez to

read Dr. Roitman's report into the record, before the jury, under Fed. R. Evid. 807's residual exception in addition to reading in his deposition testimony under Fed. R. Evid. 804. Thus Perez did have an expert at trial, notwithstanding her counsel's strategic decision, later regretted, or inexcusable neglect. Perez has not shown the district court abused its discretion.

Finally, any error was harmless. Dr. Roitman was a psychologist who testified that Perez had PTSD – an undisputed condition – and opined on treatment and treatment costs. In effect, he was an unnecessary damages expert because the jury did not find in favor of Perez on liability. This issue was therefore mooted by the jury's verdict.

## VIII. PEREZ HAS NO VALID OBJECTION TO THE MAGISTRATE JUDGE'S ORDER AWARDING ATTORNEY'S FEES IN CONNECTION WITH SBARRO'S MOTION TO COMPEL, OR WITH RESPECT TO THE DISTRICT COURT'S ORDERS ON DEFENDANTS' BILLS OF COST

Wedged amongst her substantive arguments, Perez contends that an award of attorneys' fees against her related to a discovery motion as well as four post-trial bills of costs must be vacated "as they are uniformly premised on the validity of the orders and judgments" issued by the district court that she claims are all wrong. AOB, at p. 51. She is mistaken.

The magistrate judge awarded Sbarro its attorneys' fees in connection with a successful motion to compel under Fed. R. Civ. P. 37(a)(5)(C). 1-ER-81-86. The

dispute concerned Perez's failure or refusal to provide contact information for witnesses during discovery. *See id*. The attorney's fee order had nothing to do with the issues that are part of Perez's appeal. Thus, there is no basis to vacate this fee order and Perez does not explain otherwise.

With respect to the bills of cost, Perez was required to file any objections within 14 days. Fed. R. Civ. P. 54(d)(1); Local Rule 54-1(c). She did not. Her failure to do so required the Clerk to enter the bills of cost as submitted and constituted a consent to the amounts requested. Local Rule 54-1(d). While she was entitled to file a motion to re-tax (*id*.), she did not do so. She thus waived any right to object to the amounts awarded. Absent vacatur, she is obligated to pay the same.

## IX. THE DISTRICT COURT DID NOT ERR IN AWARDING EACH PARTY THREE PEREMPTORY CHALLENGES OR IN DENYING PEREZ'S POST-TRIAL MOTION TO RECONSIDER THE ADMISSIBILITY OF IMMIGRATION EVIDENCE

Perez next argues that the district court erred in allowing Ceballes and Sbarro to exercise three peremptory challenges, each. This issue is reviewed for an abuse of discretion. *United States v. Warren*, 25 F.3d 890, 894 (9th Cir. 1994).

The district court "must allow the number of peremptory challenges provided by 28 U.S.C. § 1870." Fed. R. Civ. P. 47(b). "In civil cases, each party shall be entitled to three peremptory challenges." 28 U.S.C. § 1870. At trial, there were technically four parties: Perez; Ceballes; Sbarro, LLC; and Sbarro, Inc. Under the

plain text of Section 1870, each Sbarro defendant was entitled to its own set of three challenges. Nonetheless, Sbarro proceeded as a single entity and received three total.

Perez claims that the "Sbarro defendants" had "three challenges *each*" (AOB, at p. 52) (emphasis in original), however she is referring to Ceballes on the one hand and the Sbarro entities on the other. Ceballes was named individually, represented by separate counsel, and subject to different claims. Sbarro had different legal defenses than Ceballes, including an affirmative one for which it bore the burden of proof in its *Faragher-Ellerth* defense. Moreover, having sexual relations in the workplace, even if consensual, was against policy and would have resulted in termination if discovered (10-ER-2620-21); Ceballes and Perez hid the existence of their relationship from Sbarro, and Sbarro was adverse to Ceballes in at least that sense. Ceballes and the Sbarro entities were not one in the same as Perez contends.

While Section 1870 states that several defendants "may" be considered as a single party for purposes of making challenges, it provides discretion to the judge. *Standard Industries, Inc. v. Mobil Oil Corp.*, 475 F.2d 220, 225 (10th Cir. 1973) ("By use of the word 'may,' [in this Section] we have held that this latter provision confers a judicial discretion on the trial court."). Perez once again provides no authority or analysis supporting her challenge. Sbarro has located no Ninth Circuit authority that would lean the other way but notes that the Fifth Circuit has explicitly found that a "trial judge did not abuse its discretion in . . . allowing the plaintiff three

peremptory challenges, and the same number to each defendant" *Nehring v. Empresa Lineas Maritimas Argentinas,* 401 F.2d 767 (5th Cir. 1968). Such is the case here, and Perez has failed to demonstrate otherwise.

Perez further argues in this section (AOB p. 51-53) that the district court committed error in denying her motion to reconsider its prior order about the relevance of the immigration evidence. To the contrary, this evidence was highly relevant, as already explained, and went to Perez's motive; Sbarro was entitled to explain to the jury *why* it was accusing Perez of lying. The district court has "broad discretion in admitting evidence," *Ruvalcaba*, 64 F.3d at 1328, and, as it repeatedly explained: (i) Perez introduced evidence concerning her citizenship status: she argued that Ceballes and Sbarro preyed on illegal immigrants; (ii) Perez pursuing a T or U Visa is relevant to her motive to fabricate claims against Sbarro and Dorado, whether or not she ultimately applied for such a visa after filing this lawsuit; and (iii) Sbarro was entitled to cross-examine Perez concerning misrepresentations she made to the government in those proceedings under Fed. R. Evid. 608(b). 15-ER-4171-72:4 (transcript of hearing on motions in limine); 13-ER-3394-95 (transcript of hearing on Perez's motion to reconsider); 6-ER-1413-16 and 1418-21; 10-ER-2700-16 (arguments concerning immigration relevance); 10-ER-2760-11-ER-2844 and 11-ER-3044-12-ER-3147 (immigration experts' testimony); 1-ER-9-10 (order denying Perez's post-trial motion on the topic). Perez has again failed to articulate

any argument supporting her request, *see* AOB at 51-53, and cannot show the district court abused its discretion in allowing this evidence.

## X.    THE DISTRICT COURT DID NOT ERR IN ITS RULINGS ON PEREZ'S MOTIONS IN LIMINE

Perez next challenges the denial of her motions in limine and for spoliation sanctions in the minute order at 1-ER-48. AOB, at p. 53-54. The minute order refers to the transcript of those proceedings (15-ER-4117-4181) as part of the ruling. Six motions were ruled upon involving 19 separate issues. Perez does not identify what portion(s) of the numerous rulings in 1-ER-48 are wrong nor does she provide any analysis or legal support. She simply cites to her underlying briefing before the district court on those matters. That is improper. *Indep. Towers of Wash.*, 350 F.3d at 929; *Han v. Stanford Univ.*, 210 F.3d at 1040 (dismissing appeal where brief contained allegations unsubstantiated by appropriate references to the record); *Entm't Research Group, Inc.*, 122 F.3d at 1217. To the extent this Court is willing to review her full briefing before the district court to piece together Perez's appellate arguments, then Sbarro respectfully incorporates its own briefing by reference. 15-ER-4202-16-ER-4343 (briefing) and 15-ER-4117-4181 (transcript of hearing).

## XI. THE DISTRICT COURT DID NOT ERR IN ITS RULINGS ON PEREZ'S MOTIONS FOR SPOLIATION

Elsewhere, Perez argues that Sbarro spoliated evidence, in particular surveillance footage and the physical cooler door. AOB, at p. 31-33. She is wrong.

### A. There was no surveillance footage and Sbarro did not destroy any such evidence

Perez first contends that Sbarro "misrepresented whether the camera was functional" and affirmatively states that "the camera was in fact operational[.]" AOB, at p. 31. Perez cites nothing in the record.

The only witness with personal knowledge of the surveillance cameras was Shearer, who was personally responsible for the system.  10-ER-2594, 2603. He testified that the camera system at the Sbarro Monte Carlo did not work, "not even once[,]" while Perez was employed there. *Id*. at 2605-07. Shearer explained in great detail why, the summary being the Monte Carlo did not provide enough internet bandwidth to remotely access the cameras and attempts to do so caused other essential store operational functions to shut down. *Id*. Most importantly, Sbarro abandoned the camera system a full year prior to Perez's hire. *Id*. Shearer testified that Sbarro did not destroy camera footage and that he "never even had access to it." *Id*. at 2607.

### B.    Sbarro did not "destroy" the physical walk-in cooler

Perhaps the biggest red herring at trial was the argument that Sbarro "destroyed" the walk-in cooler at the Monte Carlo, and that had it been preserved it would have revealed a "lock" on the interior the door. There is no obvious reason to preserve a physical cooler in an employment case, and Perez did not ask Sbarro to do so.  And Perez's argument is false.

Perez first made this argument in her pretrial spoliation motion. 17-ER-4711-4780. The district court denied her motion but allowed the issue to be presented to the jury if Perez could muster evidence to support her spoliation claim. 15-ER-4132-33.

Perez told the jury in opening they would hear evidence that Sbarro and its "high priced corporate attorneys" facilitated the "destruction" of the cooler door and intimidated witnesses to hide evidence of a lock "to protect their money." 4-ER-977-98.[15] Perez did not call any witness to support counsel's assertions or otherwise testify that Sbarro destroyed the walk-in (or any other evidence), apart from her own testimony.

---

[15]  It is curious that Perez claims she is entitled to a mistrial because of comments made in Sbarro's opening about her counsel's involvement in these events, yet at the same time her counsel told the jury in opening that Sbarro's "high priced" lawyers intimidated witnesses and facilitated the destruction of evidence, neither of which was supported by the evidence.

Shearer explained in detail why the walk-in cooler was not "preserved," testifying as he had in his declaration in support of Sbarro's opposition to Perez's February 2022 spoliation motion on the topic (16-ER-4500-03). In sum, he explained that: (i) there was never a lock on the interior of the door; (ii) the referenced mechanism was a push-knob that would release the latch (distinct from a lock, shown below) if the door was equipped with one; (iii) the door had no latch during Perez's tenure and, therefore, there was no need for a push-knob to release it (which explained the "hole" in the door); (iv) Sbarro upper-management conducted unannounced audits and created reports that were reviewed by Shearer (the "SOEs"), and if a lock was present it would have been noted in the SOEs and removed immediately;[16] (v) the walk-in is large, heavy, and bolted into the foundation of, and constructed around, the landlord's property; (vi) it is considered a restaurant fixture that stays with the landlord when Sbarro vacates; (vii) in Shearer's nine years with Sbarro he had overseen the closure of 225-250 locations and left the cooler with the landlord each time; (viii) it is more economical and practical to do so; (ix) Sbarro followed that same procedure when the Monte Carlo closed and terminated Sbarro's lease; and (x) Sbarro did not destroy any evidence. *See* 10-ER-2595-2602, 2649-2655. Shearer was unequivocal about it. *Id*. at 2602

---

[16]   The SOEs were submitted as exhibits to Sbarro's opposition to the original spoliation motion. 16-ER-4543-86 and 17-ER-4588-4652.

("Q: This door and this lock issue has taken on a life of its own in this trial. So I'll just ask you point blank: Did Sbarro destroy any evidence? A: Absolutely not."); *id*. at 92-93 (same). There was no "destruction" of evidence, much less with ill intent. 1-ER-19 (district court noting that a "party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of its business.") (quoting *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 758 (9th Cir. 2009)).

Most tellingly, the walk-in was inspected by numerous individuals as part of both Sbarro's and NERC's investigations, prior to the Monte Carlo's closure. Sbarro gave NERC investigators free reign to inspect the premises, which they did, and to take pictures. 10-ER-2654. NERC confirmed there was no lock. 1-SER-21-23. Had Perez or her counsel responded to Sbarro's outreach, Sbarro would have invited them to join in the May and September 2017 site inspections as there was nothing to hide. *Id*.

Perez is the *only* witness who testified there was an interior lock; every other witness contradicted her. 7-ER-1880 (Hernandez); 1-SER-21-23 (Harris)[17]; 9-ER-2300 (Ceballes); *Id*. at 2424 (Kotchka); 10-ER-2548-49 (Dorado); *Id*. at 2576-77 (Garcia); *Id*. at 2653-55 (Shearer). While Cadacio originally testified that she

---

[17] Perez submitted with her excerpts a transcript of Harris' testimony containing a scrivener's error. So as not to overburden the record, Sbarro submits only the corrected page that is referenced and the court reporter's authentication.

believed there was a "lock" on the interior of the cooler door in *2011 – 2013* (years before Perez started), she was impeached with the following demonstrative photograph of a push-knob (10-ER-2658-60):



10-ER-2588-90.[18]

Cadacio confirmed this is the mechanism she was referring to when she described a "lock." *Id*. When asked if she was aware the push-knob was not a "lock," she responded that it "looks like [it] to me." *Id*. While Cadacio did not appreciate the distinction between a push-knob and a lock, she confirmed indirectly that there was no "lock" on the interior. Perez was free to cross-examine her on this point but asked a single badgering question: "Q. So after you lied several times yesterday,

---

[18] The district court twice instructed the jury that this was not a photograph of the Monte Carlo cooler door. 10-ER-2659-60; 12-ER-3265-66.

you're coming back today to lie about the lock? A. I didn't lie. DR. FOLEY: No further questions." *Id*. at 2592. Cadacio's indirect confirmation that there was no "lock" on the interior was consistent with each of the seven other witnesses who testified on the issue.

Despite having elicited zero support, Perez argued for instructions to go to the jury that Sbarro destroyed a host of evidence, including the cooler and door. 12-ER-3199-3218. Having sat through nine days of trial, the district court correctly determined she had adduced no testimony or other evidence to support that assertion. *Id*. at 3215; 11-ER-3085 (discussing proposed jury instruction on spoliation); 12-ER-3200-18 (same).

In closing, Perez's counsel – again misunderstanding or misrepresenting the difference between a latch and a lock – nonetheless argued to the jury that Ceballes locked Perez in the cooler using a "latch" and raped her. 12-ER-3294. The jury did not believe Perez's testimony, was not persuaded by her counsel's argument, and instead believed every other witness who refuted Perez's claim. *Jordan*, 847 F.2d at 1375 ("credibility determinations are insulated from appellate review"); *Nuelsen*, 293 F2.d at 460 (factfinder's "appraisal of the credibility of the witnesses is to be accepted, no challenge to such appraisal being permissible in the appellate court.").

## XII.   DEFENDANTS DID NOT ENGAGE IN PROHIBITED "GOLDEN RULE" ARGUMENTS

Finally, Perez argues that "Golden Rule" statements during closing arguments require reversal. AOB, at p. 54. "[A]ttorneys violate the 'golden rule' by asking the jurors to place themselves in the plaintiff's position." *Taddeo v. Am. Invsco Corp.*, 2015 U.S. Dist. LEXIS 94052, *24 (D. Nev. July 20, 2015). But Perez cites no statements from defense counsel asking the jurors to place themselves in Perez's position, thus her argument is misplaced. *Id.; see also United States v. St. Marks*, 460 Fed. Appx. 682, 683 (9th Cir. Dec. 2, 2011) (unpublished) ("The parties dispute whether or not this statement was a prohibited 'golden rule argument,' a label that is more typically attached to requests by **a prosecutor or plaintiff's attorney that the jurors step into the shoes of the victim or plaintiff**.") (emphasis added) (citing *Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir. 2002)).

The backwards nature of this argument aside, Perez concedes that she did not object during closing argument (AOB, at p. 59), thus the record is reviewed for plain error. *United States v. Soto*, 769 Fed. Appx. 472, 473 (9th Cir. May 1, 2019) (unpublished) ("[Appellant] did not object [to "Golden Rule" arguments] at the time, so these statements are reviewed only for plain error.") (citation omitted). Perez's failure to object is telling and, beyond that, her "[f]ailure to seek a mistrial [] weighs against a determination of prejudice" as it concerns the allegedly improper statements. *Howard v. Connett*, 2017 U.S. Dist. LEXIS 172130, *9-10, 2017 WL

4682300 (D. Nev. Oct. 17, 2017) (*citing Cooper v. Firestone Tire and Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir. 1991)).

None of the statements Perez complains of are "Golden Rule" arguments. The only ones attributed by her to Sbarro's counsel are portions in which counsel walked the jury through the verdict form and explained why the evidence dictated defense responses to the questions posed. AOB, p. 58. This is proper, and Perez cites no authority to the contrary. *See Landes Const. Co., v. Royal Bank of Canada*, 833 F.2d 1365, 1374 (9th Cir. 1987) ("The form of the verdict should be decided before closing argument so that counsel may structure their arguments…accordingly."). Finally, her generalized claims that statements in closing were "prejudicial" or "inflammatory" is a non-sequitur as all evidence against her is inherently prejudicial and closing is intended to be argument. She does not show that any portions of closing argument exceeded appropriate bounds.

## CONCLUSION

This Court should dismiss Perez's appeal as to Sbarro because her claims were time-barred. In the alternative, this Court should affirm the district court's rulings and the jury's verdict, which are supported by substantial evidence.

Dated April 26, 2024.                    Respectfully submitted,

                                                        GREENBERG TRAURIG, LLP

                                                        By: /s/ *Jason Hicks*

LITTLER MENDELSON, P.C.

By: /s/ *Patrick Hicks*
*Attorneys for Sbarro*

## <u>STATEMENT OF RELATED CASES</u>

Sbarro is unaware of any related cases pending before this Court.

Dated April 26, 2024.                    Respectfully submitted,

                                         GREENBERG TRAURIG, LLP

                                         By:  <u>/s/ *Jason Hicks*         </u>
                                         *Attorneys for Sbarro*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number:** 23-15702

I am the attorney or self-represented party.

**This brief contains 20,438 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[ X ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** *s/ Jason Hicks*         **Date:** April 26, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*